**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA ARNOLD, individually and as Special Administrator of the Estate of MARTINEZ WINFORD, now deceased, | ) | |
| Plaintiff, | ) | 09 C 1617 |
| v. | ) | Judge Zagel |
| THE CITY OF CHICAGO, et al., | ) | |
| Defendants. | ) | |

## RESPONSE TO MOTION TO BAR JOHN LARSEN AS AN EXPERT WITNESS

This case involves the fatal police shooting of Martinez Winford by Chicago Police Officer Zachary Rubald on August 22, 2008. The shooting occurred in the alley behind 651 E. 89th Street in Chicago. According to Rubald and his partner Romero, they were in their patrol car following Mr. Winford, who ran down the alley until he reached the fence and gate leading into the back yard of the residence at 651 E. 89th Street. The officers claimed that at this point, "all in one motion," Mr. Winford surmounted the fence and while atop it, spun around and pointed a gun down at them as they were sitting in their car essentially next to him. In response, Rubald claimed to have rapidly fired twice at Mr. Winford, hitting him once, fatally.

John Larsen is a retired Special Agent of the Federal Bureau of Investigation who has conducted, taught, and testified as an expert, about virtually every facet of crime and shooting scene investigation and reconstruction. (See Larsen curriculum vitae, Motion Exhibit F). He conducted an exhaustive investigation and analysis of the shooting scene, taking into account, inter alia, the testimony of defendants and the medical examiner.

Mr. Larsen's anticipated testimony involves two primary areas. First, he will testify that

the position from which the officers claimed Rubald shot Mr. Winford is contradicted by the trajectory of the bullet path through Mr. Winford's body. Second, he will testify about the discovery of a bullet hole through a garbage can positioned *long before* the gate at which Mr. Winford was shot. The bullet hole was consistent with that of a firearm of the kind and caliber used by Rubald that night. This evidence supports the theory that Rubald shot at Mr. Winford while the latter was fleeing down the alley, well before reaching the gate on which he performed the acrobatics that Rubald claimed gave rise to the need to use lethal force in self-defense.

## A.
## The Trajectory of the Bullet Path Through Mr. Winford's Body

Mr. Larsen evaluated the feasibility of Mr. Wnford being shot in the way described by the defendants in light of the bullet path through his body reflected in the coroner's report. To that end, Mr. Larsen conducted several physical experiments with an evidence mannequin with a build similar to Mr. Winford's. He inserted a rod through the mannequin in accordance with the bullet path of the medical examiner's report and thereafter placed the mannequin in various positions about the actual shooting scene gate Included within them was a position where the mannequin was atop the gate, but turned around to face the officers in order to point a gun at them as they said occurred just before shooting him. The report concludes that being shot in this position is inconsistent with the trajectory line of the bullet through Mr. Winford.

Other positions were examined as well, one of which was consistent with the trajectory of the fatal bullet as well as Officer Rubald's shooting position–where Mr. Winford was essentially diving over the gate. In this position, however, Mr. Winford could not have been turned toward the officers pointing a gun at them as they claimed. (See Motion, Exhibit A, at 5, 7-8, 13-17).

Defendants concede that Mr. Larsen's trajectory presentation was based upon the measurements of the medical examiner's report. They have moved to bar his testimony on the ground that he selected a *particular* point of the bullet's lodging in Mr. Winford's left pectoralis muscle without considering "an x-ray examination of Winford's body, which one would assume shows the exact lodging location of the bullet...." (Motion 5). Tellingly, defendants have not provided the Court with the x-rays or selected an alternative location based upon them, as would be expected if they contradicted Mr. Larsen. Instead, there is only the "assum[ption]" that they would show something different, and do so with "exactitude." We have reviewed the x-rays and can represent that they do not. [1] Indeed, the medical examiner herself had the x-rays, which only allowed her to place the bullet "within the anterior left chest." (Motion, Exhibit B at 3). Asked if she could "tell where in the pectoral muscle exactly the bullet came to rest," she responded, "Oh, I can't tell you the exact location. It was within the left pectoralis muscle." (Motion Exhibit C, at 8-9).

Under Defendants' thesis, no selection by Mr. Larsen within the left pectoralis would have satisfied them, even though the medical examiner herself could make no "exact" selection within that same area. No case is cited for the proposition that this somehow disqualifies Mr. Larsen. And one does not need to have a degree in forensic pathology to essentially draw a line between two points, even if the latter point cannot be pinpointed with exactitude.

The same coyness is seen in defendants' speculation that "perhaps had Larsen considered these alternative trajectory angles [based upon alternative points in the left pectoralis], the experiments he conducted would have had different results. Perhaps, even, those experiments

---

[1] Should the Court require them, we shall make them available immediately.

would have then revealed the Officers' version of events to be scientifically established." (Motion 6). "Perhaps" if Defendant's theory were remotely accurate, they would have come forward with proof to support it in order to not only discredit Mr. Larsen, but to "scientifically *establish"* their position. Again, there is nothing.

Defendants will be free at trial–as they have been to this date--to manipulate the trajectory rod as they like through different areas of the left pectoralis musculature. Because the left pectoral area of a slight, 149 lb. boy is not some vast expanse, the result will not be materially different, and defendants know it–otherwise there would a demonstration of how it would be. This Court itself can confirm this by simply inserting a projectile object such as a needle through any cylindrical object in the areas reflected in Mr. Larsen's and the medical examiner's report and varying the top position somewhat. No matter the alterations, the moment one turns the cylinder to face the police in the way they described, the entry trajectory point becomes wholly inconsistent with the officers' account and the remainder of the trajectory path, because it puts them well *past* Mr. Winford, not next to or approaching him as they testified. Nothing about this is "speculative," "unreliable" or "confusing" to a jury. (Motion 6). Compare Schnur v. Kohl's Department Store, 2010 WL 4930687 *2 (N.D.Ill. November 29. 2010)(Zagel, J.))("the precise measurement of the deviations is not essential to [the expert's] conclusions, anyway, as he indicated in his deposition that they would be the same for any deviation greater than 1/4 inch").

In short, Mr. Larsen's trajectory analysis tracked the medical examiner's conclusions and consistent with them, selected a reasonable point within the left pectoralis muscle. Phrased differently, he "start[ed] from...reasonable estimates from the information available " See Lapsley v. Xtek, Inc., 2012 WL 3055865 *9 (7th Cir. July 27, 2012). Nothing in Daubert makes

unreliable the fact that his methodology did not include theoretical evidence that the medical examiner could not support, and the actual impact of which the defendants have carefully refrained from discussing, other than the *ipse dixit* that it "perhaps" might be significant. Mr. Larsen was not required to make adjustments to take into account *every* slight deviation in a small area in order to exclude all other theoretical possibilities–none of which defendants can say would change anything. See McCall v. Skyland Grain, LLC, 2010 WL 2543574 *4 (D.Colo. June 22, 2010)('an expert is not required to exclude each and every possible alternative cause before such an approach is considered reliable' under *Daubert.*).

Indeed, even if defendants offered actual *evidence* to contradict Mr. Larsen, that would not bar Mr. Larsen's testimony, even if he did not consider the contrary evidence. See Schnur, supra, 2010 WL 4930687 at *2 (it "does not matter that there is other evidence which [the expert] did not review that contradicts his assumption. Defendant is free to submit evidence contradicting the underpinnings of the report, which may affect the consideration and weight given [the expert's] conclusions"). Because Mr. Larsen's unrebutted trajectory analysis was reasonable, defendants' attempt to bar his resulting conclusions concerning Mr. Winford's possible body positions when shot predicated upon that trajectory necessarily fails. (Motion 8-9).

Nor is Motion furthered by the claim that Mr. Larsen's experiments inaccurately had the mannequin "standing on top of the gate." (Motion 9). Contrary to the contention that the officers never placed Mr. Winford as standing on top of the gate, id, this is exactly what they said, among other things.

Q: Okay. So he starts to climb this gate, as I understand it?

A: He is going over the gate.

Q: Okay. And what happens *when he gets to the top of the gate*?

A: Well, I observe him with the handgun pointed in my direction."

Q: Okay. Doe he–is it that he gets *on top of the gate,* and then turns to point–

A: It's all in one motion. It's very fast.

Q: Okay. Let's try to take it slow. I understand that it occurred quickly, but I want you to describe the motion as best you can. When does–is there ever a point when he begins to turn back towards you to point that gun?

A: When he goes over the fence, he is facing–he has got his body on an angle towards me. He has got his gun pointed towards me.

Q: Okay. So he is *on top of the fence.* He has got his body turned back towards you, and he is pointing a gun at you?

A. *Yes.*

* * *

Q: Do you remember if his motion was such that he was going to lift himself and hop over the fence, or was he going to–was he climbing over it?

A: He was not climbing over it.

Q: So he had–well, was it one motion that he kind of lifted himself up *on top of the gate?*

A: *Yes.*

* * *

Q: He then, when he is *on top of this gate* points, back at you. Points his gun at you. How long was his gun pointed at you before you fired.

A: I fired immediately as soon as I saw the gun pointed at me.

* * *

Q: Okay, Could you tell when he *was on top of that gate* if you had hit him?

A: I wasn't sure if I had hit him or not. (Rubald Dep., Motion Exhibit E at 49-52)

Officer Romero also placed Mr. Winford on top of the gate:

A: I mean he was just *at the top*, and that is when he pointed the gun. And that is when my partner fires.

Q: Okay. We will get there. But he gets somehow *on top of the gate?*

A: Yes.

Q: All right. And *were both his feet on top of the gate or just one of them*?

A: I am not sure. It happened fast.

* * *

Q: Do you remember when he got *on top of the gate, was he standing?* Was he crouching?

A: Not sure.

Q: Was the gate between his legs?

A: I am not sure.

* * *

Q: Was he *on top of the fence*–that is where we left off. He was *on top of the fence*, pointing at Officer Rubald, correct?

A: Yes.

(Romero Dep., Motion Exh. D at 82-87).

If, as the Motion hints (with no evidentiary support), Mr. Winford was on top of the gate, but not "standing" on it, this would suggest that he was suspended in the air above the gate. For there are only two reasonable possibilities for being on top of the gate–you're either *on* it, or *above* it.[2] The Motion does not explain, however, how this slight difference *in altitude* would

[2] There was no evidentiary support for any other alternatives. Romero could not say that Mr. Winford was "crouching" on the gate (Dep. at 82), and Rubald never did. The less than (continued...)

change the trajectory analysis. *Both* prospects were impossible given the trajectory of the bullet.

Defendants also offered an alternative version in which Mr. Winford's feet were neither standing on the gate nor suspended above it. As we shall see, this too was impossible. In this account, defendants had no idea *where* Mr. Winford's feet were or where they went. In this variation, Mr. Winford started by "planting" his left hand on the fence, (See Romero testimony, Motion Exh. D at 80) and did not hurdle it as Rubald stressed, as he tried to "imagine" what happened:

Q: Did he hurdle it?

A: No. He put his hand on the fence - -

Q: Which hand did he put on the fence?

A: His left hand. And I would imagine he is hopping over it. I couldn't tell you exactly because I am coming at him [sic] a pretty decent speed." (Rubald Dep. 47, Exhibit 1 hereto).

Neither officer, however, could remotely explain *how* this occurred, even with their vivid imaginations. Thus, neither could speak to the simple movement that necessarily would have followed the hand planting, namely the swinging of the legs/feet over the fence. Neither could say where his feet went or even if they went to the right or the left (Motion, Exh. D at 81; Motion Exh. E at 50). *Either* direction disproved the rest of their story.

If after planting with his left hand, Mr. Winford somehow swung his feet to the left, he

---

[2](...continued)
three-feet wide gate was too small for that in any event, (See photograph at p. 7 of Larsen Report, Motion Exh. A), and turning while crouching on the gate is refuted by the trajectory analysis in the same way that turning while standing on or flying over it is. Nor did either say Mr. Winford's stomach, back or side were on the gate, as might be the case if he were rolling over it–which they never claimed--versus "jumping" over it, as they did.

could never have gone over the gate, as can be seen by the picture at page 7 of Mr. Larsen's report. (Motion, Exh. A at 7). And one never would have done this if the goal was to actually go over the gate, since this movement prevented it. If the goal was *not* to go over the gate and to instead wheel around and shoot, there was no need to plant a hand on the gate or to go airborne at all.

Conversely, if the intent was to surmount the gate, the only natural movement over it after planting with his left hand would have been to swing his feet to the right and upwards over the fence. But this movement would have kept Mr. Winford's *back* to the officers and prevented this twisting backward *toward* them to point the gun at them as they claimed. The only other possibility is that his feet went directly beneath his body, but apart from how that could have occurred physically, it too would have prevented the mid-air spin backwards to face the officers. Indeed, in each of these scenarios, Mr. Winford's forward momentum would have prevented the twist backward. As Mr. Larsen put it, Mr. Winford would be "moving forward and...his momentum would keep him from doing anything but trying to clear the top of the gate." (Exh. A at 14).

Accordingly, the officers' internally inconsistent accounts that variously put Mr Winford atop the fence or planting a hand to propel his feet over it, were flatly contradicted by the evidence, to say nothing of impossible. Little wonder neither could provide any details of how this actually occurred. Yet, Mr. Larsen is chided for his equal inability "to conceive how Winford could have physically" done what the officers claimed. (Motion 12). The officers' inability to describe this is not masked by saying it all happened "very fast." (Motion 9). That which is physically impossible does not become possible merely by doing it quickly.

In sum, Mr. Larsen's opinion cannot be excluded because it did not credit *non-viable* alternatives, which defendants themselves did not and could not support. Lapsley, supra, 2012 WL 3055865 at *9 (Expert's conclusion properly "based in large part on [his] conclusion that there was no other viable explanation"). Unlike these impossible theories, Mr. Larsen's conclusion that Mr. Winford dove over the fence was consistent with the bullet trajectory as well as inertia. Diving over the fence was consistent with one other thing--the panic that would have ensued from just having been *shot at*. Thus, Mr. Larsen's "hypothesis was reliably supported and applied to the known facts, such that it rises above speculation and becomes a presentable probability." Id.

**B.**
**Rubald's First Shot That Missed And Instead Hit A Garbage Can on the Street**

The second facet of Mr. Larsen's testimony deals with an entry and exit bullet hole discovered in a garbage located well *before* the gate on which defendants claimed Mr. Winford was positioned at the time of *both* of Rubald's "rapid" shots. (See Motion, Exhibit A at 6, 9-12). As reflected in the report, Mr. Larsen will testify that the garbage can holes were from a bullet going on a downward trajectory, consistent with the path of a shot from a vehicle further down the alley and well *before* the squad car or Mr. Winford reached the gate at which he was fatally shot.

Indeed, Rubald testified that as they pursued Mr. Winford down the alley, Mr. Winford was "always a little bit ahead of [them]," "five feet or so." (Rubald Dep. 44-49; Motion 9). The pictures at page 6 of Mr. Larsen's report make clear that if the bullet hole in the garbage can was caused by Rubald, neither the officers nor Mr. Winford could have reached the gate by the time

of this shot. This fact, coupled with the indisputably *downward* trajectory of the holes through the garbage can (as opposed to a shot *upward* at Mr. Wnford atop a gate *above* Rubald ) prove that Rubald first fired at Mr. Winford while he was running down the street *away from* the officers. Mr. Winford was not, as Rubald ridiculously claimed, whirling around atop a flimsy gate to attempt a carnival-like backward shot at the officers. "In short, [the officers] lied." Compare Ienco v. City of Chicago, 286 F.3d 994, 996 (7th Cir. 2002).

Defendants challenge Mr. Larsen on two grounds here, namely whether this in fact was a bullet hole and if so, whether it occurred on August 22, 2008 rather than some other time. (Motion 7).[3]

As to the initial contention that we have supplied "no foundation" to show that this actually was a bullet hole, id, defendants make no real argument beyond that conclusion. Mr. Larsen's curriculum vitae includes such matters as "Bullet Trajectory Reconstruction," "Ballistic Field Training," and "testif[ying] as an expert in shooting incident reconstruction pertaining to a bullet hole." The notion that a shooting/crime scene veteran is unfamiliar with bullet holes is inherently unacceptable.

More importantly, defendants have kept from the Court Mr. Larsen's supplemental report of May 31, 2011, devoted to the issue of whether this was, in fact, a bullet hole. That report included Mr. Larsen's acquisition of a similar garbage can through which he fired a shot from the same model gun used by Rubald. Comparative photos of that bullet hole and the one involved here were included in the report in support of Mr. Larsen's conclusion that the two bullet hole

---

[3] The City does not dispute that the garbage can with the holes in it was the same one shown in the CPD pictures of August 22, 2008.

entries "are almost identical." (See Exhibit 2 hereto).

Mr. Larsen's thoroughness stands in stark contrast to Defendant's approach to this potentially outcome determinative issue. Asked to "identify all persons who have performed any ballistic or other examination on the Garbage bin," defendants frivolously objected on relevancy, burden and overbreadth grounds before stating that they were "unaware of any 'ballistic or other examination' performed" on the garbage can. (Exhibit 3, Defendant's Interrogatory Answers). It is unthinkable that no such examination would have been performed *if* defendants considered the hole to have resulted from anything *other* than a bullet. No less illuminating are defendants' other interrogatory answers::

> 7. With respect each of the holes in the Garbage Bin, do you believe either of them to have been caused by a bullet? If not, identify what you believe to have been the cause of each hole. In either case, state the bases for your conclusions.
>
> **Answer**: Defendant City objects to this interrogatory as vague as to "each of the holes," as irrelevant to any issue in this lawsuit, not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it seeks information beyond the City's knowledge. Defendant City further objects as it is not qualified to offer expert opinions as to causation of any alleged "holes" in garbage bin R060152526
>
> 8. Has any agent or employee of the City opined that either of the holes in the Garbage Bin was caused by a bullet? If so, provide the identity and contact information for such person(s).
>
> **Answer**: Defendant City objects to this interrogatory as vague as to "either of the holes," as irrelevant to any issue in this lawsuit, not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it seeks information beyond the City's knowledge. Subject to and without waiving said objections, Defendant City answers that it is not aware of any opinions rendered by any of its agents or employees related to City or Police business, memorialized in a report or document.

Put another way, the City's vast array of law enforcement personnel are "not qualified" to identify a bullet hole. With all the shootings in this town, they must be seeing bullet holes in

their sleep. Alternatively, the City is capable of making such a determination, but curiously chose not to "memorialize" it." Given these antics, it is the height of audacity to call Mr. Larsen's bullet hole analysis "unreliable."

Also specious is the claim that the bullet hole may have been caused by the other "gun crime" in the area between 2006 and 2001 reflected by the reports the City produced in discovery. The City never took the time to examine the actual sites of the other reported gun activity to determine if a shot from *any* of them could have found its way to this garbage can. Mr. Larsen did. They couldn't have. (See Exhibit 4).

The only speculation here is the City's fallback position that the bullet hole may have been caused by "an incident that went *unreported*." (Motion 8). The basis for the occurrence of unreported shootings in this area is not identified, much less evidenced. As Mr. Larsen's report shows, there were 45 "shots fired" incidents in the area between 2006 and 2011. Only *two* were fired at this location. Thus, the City urges exclusion of Mr. Larsen's evidence because of the unsupported possibility of unreported shootings which, *if* they occurred, carried a 4.4% chance of being within the shooting range and path of this garbage can. If a factual predicate with a probability of greater than 95.6% were required, no expert could ever testify. Of course, that is not the standard in this Circuit or anywhere else. See Commercial Union Ins. Co. v. Basfield, 832 F.Supp. 234, 236 (C.D.Ill. 1993)(probability above 50% sufficient). Thus, uncertainty about other possible sources of an item (such as a bullet hole) "goes to the weight of [the expert's] testimony, not to its admissibility." United States v. Cyphers, 553 F.2d 1064, 1072-73 (7th Cir. 1977)("The mere possibility that the hairs recovered from the garments might have come from a third party, rather than from one of the robbers, is, in our view, a matter that goes to the weight to

be given the expert testimony, rather than to its admissibility").

It is true that Mr. Larsen did not "explain why or how he concluded that the second shot fired by Rubald is the one that struck Winford, as the Officers testified that Rubald fired two shots in rapid succession." (Motion 7 n.2). But does this really require explanation? If the downward bullet hole path through the garbage can was caused by Rubald, it obviously missed Mr. Winford. If, as defendants muse, this missed shot was the second shot, rather than the first, it meant that Rubald shot Winford on the gate, and then backed the car up substantially in order to be able to shoot the garbage can. This sort of silly obduracy is the hallmark of the Motion to Bar.

Unfortunately, none of this evidence was probed that night or thereafter by the CPD. Among other failings, it conducted no trajectory analysis; it overlooked the bullet holes in the garbage can, despite the fact that it could not account for the other bullet fired or even its shell casing; it asked not a single question of the officers about the specifics of how Mr. Winford could have possibly performed the jump and spin maneuver they claimed and never even noted its difficulty if not impossibility. Mr. Larsen's conclusion that the investigation of a *fatal* shooting left something to be desired was justified. (Motion 12). To be sure, all of his conclusions are not only reliable, they are undeniable. The only testimony that might be "confusing and misleading to the jury" is the officers' gibberish. (Motion 10).

**Conclusion**

On August 22, 2008, Zachary Rubald executed a 16 year-old . The only thing"simply made up" (Motion 7) was his self-defense story. It was reminiscent of his farcical self-defense claim after his July, 2007 shooting of Lamont Coleman, whom he claimed dropped his gun

immediately before charging Rubald's then partner, who had his own gun drawn. Rather than firing at the charging Coleman, Rubald's partner attempted, unsuccessfully, to *holster* his gun (perhaps to make it a fair fight). As Coleman and the partner struggled for the latter's gun, Rubald ran over, kicked Coleman in the face and shot him "because he had hold of my partner's gun and I thought that my partner or myself were going to get injured or killed." (See Exhibit 5, Rubald testimony). Apparently, like Mr. Winford, Coleman sought to make himself as defenseless as possible before inviting lethal force.[4] Rather than condemn Rubald and his partner in perjury and mayhem, the City seeks to keep the jury in the dark. Its motion to bar should be denied.

Respectfully submitted,

Andrew Staes

Staes & Scallan, P.C.
111 W. Washington St.
Suite 1631
Chicago, IL 60602
(312) 201-8969

[4] Mr. Coleman denied all of this. We shall seek permission to adduce this evidence by separate motion. See United States v. Fountain, 768 F.2d 790 (7th Cir. 1985)(evidence of prior acts of aggression admissible to rebut current claim of self-defense).

CERTIFICATE OF SERVICE

I, Andrew Staes, hereby certify that I have caused Plaintiff's Response To Motion To Bar John Larsen As An Expert Witness to be served upon:

Kathleen D. Crawford
City Of Chicago, Department Of Law
Federal Civil Rights Division
30 N. LaSalle Street
Room #900
Chicago, Illinois 60602
*via ECF filing notification and U.S. Mail on August 20, 2012.*

Liza Marie Franklin
City Of Chicago, Department Of Law
30 N. LaSalle Street
Room #1400
Chicago, Illinois 60602
*via ECF filing notification and U.S. Mail on August 20, 2012.*

ANDREW STAES