**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA ARNOLD, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 1617 |
| | ) | |
| v. | ) | Hon. James B. Zagel |
| | ) | |
| THE CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO BAR TESTIMONY OF JOHN LARSEN

Defendants City of Chicago, Officer Zachary Rubald and Officer Miguel Romero move pursuant to Federal Rule of Evidence 702 to bar the expert opinion testimony of John Larsen. In support of this motion, Defendants state as follows:

## BACKGROUND

At approximately 8:00 p.m. on August 22, 2008, Chicago Police Officers Rubald and Romero responded to reports OF "person with a gun" and multiple shots fired in the area of 600 East 87th Place in Chicago, Illinois. As the officers approached in their marked squad car, a group of African-American males on the sidewalk scattered and ran away. The officers pursued Martinez Winford in their squad car. Winford drew a gun from his waistband as he ran in the alley; as he scaled a fence at the side of the alley, he turned and pointed the gun at the officers. Officer Rubald fired his service weapon twice at Winford in defense of the officers' lives. One bullet struck Winford, who died shortly thereafter from that wound. *See* Case Supp. Report at 11-12, attached as Ex.1.

Plaintiff, Winford's mother, has retained John Larsen to provide expert testimony on crime scene reconstruction. In April 2011 – three years after the shooting -- Larsen visited the scene and noticed two holes in a garbage bin sitting in the alley. Based on this evidence alone,

Larsen concluded that Officer Rubald selected Winford for deliberate, unprovoked execution. Larsen's March 20, 2013 and May 28, 2011 reports (attached as Exhibits 2 and 3) as well as his March 27, 2013 deposition testimony (transcript attached as Exhibit 4) make clear that each of his conclusions is based entirely on speculation and unreliable methodology.

## ARGUMENT

The trial judge plays a "gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 597 (1993). Expert opinions are admissible only if "(1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011). Plaintiff bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### I. All Opinions Related To Larsen's "First Shot" Theory Must Be Excluded.

During a visit to the scene on April 9, 2011, Larsen and his assistant were working in the alley. Ex. 4 at 281:19-282:4, 283:16-18. According to Larsen, his assistant was "sitting there with a light, and he's just going across, and all of the sudden that green laser went right in the hole in that garbage bin" printed with the number R060 152526. *Id.* at 282:5-8; Ex. 2 at 3. Larsen inspected the bin, and found two holes in it. Ex. 4 at 283:6-9. From noticing two holes in a garbage bin nearly three years after the shooting, Larsen leapt to three wild conclusions:

1. The holes were entry and exit holes made by Officer Rubald's errant bullet (the shot that did not hit Martinez Winford). *Id.* at 289:19-23.

2. Officer Rubald fired this first shot at Winford's back as he fled down the alley but before he reached the gate. Ex. 2 at 11; *see also* Ex. 4 at 239:9-13.

3. Officer Rubald's shooting of Winford was a deliberate execution. *Id.* at 239:9-13.

This is just the type of unsupported speculation which the Seventh Circuit has held must be excluded. "[A] district court is required to rule out subjective belief or unsupported speculation by considering whether the testimony has been subjected to the scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999). The scientific method "consists of identifying the problem, gathering data, formulating hypotheses, performing experiments, interpreting results, and reaching a conclusion." Frank R. Spellman & Joni Price-Bayer, *In Defense of Science: Why Scientific Literacy Matters* 5 (2011). Larsen created his first-shot hypothesis and then stopped, failing to verify his hypothesis in any way. His "first shot" theory lacks even a nodding acquaintance with the scientific method, and therefore must be excluded.

**A. Larsen's Opinion that the Holes Were Made During the Winford Incident Is Nothing More Than Wild Speculation.**

There is no way to scientifically establish even a likelihood that the holes in the bin were created by Officer Rubald's errant shot, much less a reasonable degree of scientific certainty. Nor is there any support for this fabricated idea in the record. Accordingly, all opinions related to or based upon the holes in the bin must be excluded.

**a. Determining When the Holes Were Made Is Scientifically Impossible.**

Larsen conceded there is no basis for his opinion that the holes were created by Officer Rubald during the August 22, 2008 incident:

**Q. Could you determine when these holes were made?**

**A. No.**

**Q. Is there any way to determine when the holes were made that you know of?**

**A. No.**

Ex. 4 at 299:10-15.

### b. Larsen Failed To Rule Out Other Possibilities.

Larsen made no effort to rule out other possibilities, a practice which directly contradicts the scientific method. A scientist must (1) consider and rule out more plausible explanations when formulating a hypothesis, and (2) avoid "confirmation bias" -- focusing on "data that support the claim while ignoring data that suggest it may be false." Stephen S. Carey, *A Beginner's Guide to Scientific Method* 66 (1998). This important consideration is embodied in the 2000 Advisory Committee Notes to Rule 702: whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" and "whether the expert has adequately accounted for obvious alternative explanations."

Here, Larsen had no intention of letting facts get in the way of his conclusions. After discovering the holes in April 2011, Larsen made assumptions and decisions that supported his conclusions while ignoring all alternatives. He admits that April 9, 2011 was the first time the holes in the bin had ever come to anyone's attention. Ex. 4 at 283:16-22. Subsequent to his discovery, Larsen purportedly examined an enlargement of a scene photograph (depicted in Ex. 2 at Photo Plate 2), and now claims to see the bin[1] and the bullet holes therein. *Id.* at 299:20-12. A color copy of the photograph is attached at Exhibit 5 so the Court may make its own examination. Larsen has never produced a copy of the enlargement in which he claims to have seen the holes, and cannot establish with any certainty that the alleged "holes" are not something else, such as discoloration, defects in the surface of the bin, or even shadows.

---

[1] Larsen assumes (but has made no effort to establish) that this garbage bin is the same bin appearing in the scene photographs taken the night of the shooting because both bins have the number R060 152526 printed on them. Ex. 4 at 282:9-14, 303:5-16.

Even if they were visible in the scene photographs, the holes could have been made at any point prior to when the photograph was taken. Again, Larsen admits there is no way to determine when the holes were made, and no way of knowing how long the bins in the scene photographs had been there prior to the incident. Ex. 4 at 299:10-15, 303:20-23.

Furthermore, Larsen made no effort to rule out the possibility that the holes were created after the Winford incident. For example, Larsen volunteered that a recently-made bullet hole would feature "bullet wipe" around its perimeter. *Id.* at 302:16-24. Bullet wipe[2] can be detected visually or by microscopic or chemical testing. Michael G. Haag & Lucien C. Haag, *Shooting Incident Reconstruction* 56 (2d ed. 2011). Larsen did not examine the holes for bullet wipe, nor did he perform any chemical or microscopic testing. *Id.* at 292:11-293:23. Because he entirely failed to rule out alternatives as required by the scientific method, his opinions must be barred.

**c. Larsen's Survey of "Shots Fired" Reports Is Fatally Flawed.**

When defense counsel pointed out that there have been hundreds of reports of gunshots fired in the vicinity of the garbage bin, Plaintiff demanded and received records of all service calls made in the area of the alley. Plaintiff's counsel distilled from those records "a shot[s] fired list for that area, and it covered 46 different sites in and around 65 East 89th Street." S*ee* Supplemental Report (Ex. 6); Shots Fired List (Ex. 7); Ex. 4 at 36:18-23. At each address, Larsen photographed the side of the building closest to the scene of the shooting. *Id.* at 38:22-39:19. Then Larsen "took a look at the whole property" and decided whether a shot fired from there could "reach our site" and "hit that garbage can on its facing south position." *Id.* at 40:24-41:6.

---

[2] Once fired, a bullet will deposit traces of gunshot residue and metal from its surface around the margin of its bullet holes. These deposits are referred to as "bullet wipe." Haag, *supra*, at 55.

Larsen's methodology is riddled with logical flaws; for example:

- The underlying assumption is that the bin never moved from the alley. Larsen admitted there is no way to know whether that assumption is valid. *Id.* at 303:20-23.

- The list was compiled using **reports** of shots fired. There is no way to know how many shots were fired in the area but went unreported.

- The addresses on the list are the addresses **from which the report was made**. Even Larsen admits that the address from which a report was made was not necessarily the location from which the shots were fired. *Id.* at 38:22-39:2, 40:12-16.

- The list is comprised only of reports made between June 7, 2007 and December 31, 2010. Given that (a) the shooting occurred in August 2008, and (b) Larsen noticed the holes in April 2011, the list's date range bears no connection to any pertinent facts in this case.

- Even if the shot(s) had been fired from an address on the list, Larsen contended "it didn't matter" if the shot(s) had been fired from inside or outside the building located at the address. *Id.* at 127:1-10.

Larsen's methodology cannot be anything but fatally flawed because he is trying to "prove" the impossible: there is no way to determine when the holes were made. His opinion that the holes were made during the Winford incident does not and cannot have any scientific basis.

Moreover, this token effort took place on January 7, 2012, almost a year after Larsen had already reached all of his conclusions in this case. *See* Exs. 6 and 8. He could not and did not rely upon his shots-fired survey to reach his conclusions, and therefore it is not relevant. Ex. 4 at 61:13-62:7. No testimony about it should be permitted.

**d. Larsen Admitted He Could Not Even Determine that the Holes Were Caused By the Same Type of Bullet Officer Rubald Used.**

Larsen's testimony must also be excluded because he admittedly could not "determine what kind of bullet, if any, made these holes in the bin in the alley." *Id.* at 301:15-18. Larsen's supplemental report (Ex. 3) describes his efforts to create an exemplar hole by shooting into a similar garbage bin. However, the purpose was to demonstrate that the hole in the bin from the

alley "was indeed a bullet hole." Ex. 3 at 1. He admitted that his exemplar could not establish what type of bullet made the holes, because "when you have this soft-sided-type material, it could be almost any number of calibers, 32, 38, 9 millimeter…[or] even a 45." Ex. 4 at 301:19-302:11. Furthermore, Larsen conducted this experiment after he reached the conclusions set forth in his report; he could not and did not consider it when reaching the conclusions set forth in his report. *Id.* at 61:13-62:7. Larsen did not know of any other way to determine what type of bullet created the holes. *Id.* at 302:12-303:4. Thus, he has no basis to conclude

**e. Larsen Provided No Basis for Concluding that the Holes Are Bullet Holes, Or That Both Holes Were Caused By a Single Bullet.**

Without any support, Larsen opines that the holes in the bin are bullet holes by a single bullet, dubbing one the entry hole and the other the exit hole. Ex. 2 at 9-10. Neither his report nor his deposition revealed any methodology or basis underlying that opinion except his "experience." *See* Ex. 4 at 297:5-23. "The law is clear that an expert must substantiate his opinion and that providing only an ultimate conclusion with no analysis is meaningless." *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 2003 WL 1797844, *1 (N.D.Ill. 2003) (Zagel, J.). A claim of "experience" is not a sufficient basis; if it were, "all expert testimony [would be] essentially impervious to challenge and to meaningful cross-examination." *Davis v. Duran*, 277 F.R.D. 362, 372 (N.D.Ill. 2011) (Cole, J.).

Both his report and testimony reveal that Larsen failed to do many things practitioners in his field would and should do. For example, as a general rule, an entrance hole will commonly be smaller than the exit hole. Haag, *supra*, at 57. Larsen did not even measure the purported bullet exit hole. Ex. 4 at 288:22-289:1. He also assumed (with no basis) the bin had been empty or that whatever was in there did not lessen the bullet's force as it went through the bin. *Id.* at 299:1-9.

Larsen admitted that a laboratory could determine what type of bullet created a particular hole by analyzing the hole's bullet wipe. *Id.* at 302:12-24. Presumably an analysis of any bullet wipe present could at least establish whether both holes were caused by the same type of bullet. Nonetheless, Larsen did not examine either hole for bullet wipe, nor did he perform any chemical or microscopic testing to detect it. *Id.* at 292:11-293:23.

### B. Larsen's Opinion that Officer Rubald Fired a First, Errant Shot at Winford's Back Is Also Baseless and Speculative.

Larsen opines that Officer Rubald "fired two shots while pursuing Martinez Winford who was fleeing on foot away from Rubald's vehicle…Officer Rubald fired his first shot at Winford's back and missed." Ex. 2 at 17. This "first shot" execution theory must be excluded because it is based not on evidence or reality, but rather solely on Larsen's fertile imagination. As discussed above, there is no basis to conclude that the holes in the bin are related to the Winford incident. Larsen admitted that, if the holes in the bin are not related to the Winford incident, then all of his conclusions and opinions related to those holes would be invalid. Ex. 4 at 305:22-307:12. In addition, the many flaws in Larsen's methodology also provide an independent basis for exclusion.

#### a. Larsen Has No Basis for the Estimated Angle of Impact.

Larsen determined the estimated angle of impact for his first-shot theory by inserting a trajectory rod through the two holes simultaneously. Ex. 2 at 10. Because he has no basis for his conclusion that the two holes were caused by the same bullet, he necessarily lacks a basis for his calculation of the estimated angle of impact.

### b. Larsen Provided No Basis for Opinion that the Holes' Measurements Indicate a Shot Fired From a Vehicle.

Larsen also states that his measurements of the holes "roughly correspond with a shot fired from a vehicle in which the shooter is firing from a moving platform approximately 40 to 44 inches off the ground." Ex. 2 at 11. Here again, he provides no information as to the methodology or reasoning through which he reached that conclusion.

### c. The Car's Position in the Alley Is Purely Speculative.

The "Crown Victoria was positioned in the alley as if in pursuit of the subject with the vehicle being placed more on the south side of the alley roadbed." Ex. 2 at 9. No explanation is given as to how Larsen determined where the car should be positioned. Because Larsen's first-shot theory is manufactured out of whole cloth, neither Officer Rubald's nor Officer Romero's testimony could provide a position for the car. Indeed, the chronology set forth in the report indicates that the car was placed in this position before Larsen discovered the hole in the bin. *Id.* at 9-10.

### d. Larsen Disregarded Evidence That Does Not Support His Conclusion.

If Larsen's first-shot theory were accurate, geometry indicates that, after exiting the garbage bin, the bullet would have struck the east wall of the garage behind the bins. *See* Ex. 2 at 4 (Diag. 1). Although the bullet may not remain, its impact would have created a defect in the brick wall that could still be detected and tested. Evidently Larsen agrees: he conducted "a physical inspection of the east wall of the garage, south rear wall surface of the 651 address and a metal detection sweep of the grassy area between the east wall of the garage and the fence." Ex. 2 at 7. He found nothing: "[n]o bullet defects consisting of graze marks, deflection patterns and/or other telltale marks that could [sic] left by a bullet were located. Two possible impact sites on the east wall of the garage were tested for lead and copper with negative results." *Id.*

#### e. Larsen Can Cite Only "Experience" as the Basis for This Conclusion.

As his basis for his opinion that Officer Rubald made the holes in the bin when he fired at Winford's fleeing back, Larsen cites only his experience: namely, he claims the location and angle of the bullet hole "is reminiscent of someone traveling" and is consistent with someone "sitting inside a platform such as a car." Ex. 4 at 289:24-290:19. This is not sufficient. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 (2000 Advisory Committee Notes). Larsen could not explain any of those things, and his opinion must be excluded.

### C. Larsen Should Be Barred From Offering Testimony to the Effect That Officer Rubald Carried Out an Unprovoked Execution of Martinez Winford.

In his deposition, Larsen repeatedly gave opinions to the effect that Officer Rubald intended to deliberately execute Winford:

- "I thought I made it fairly clear that Rubald has already made the decision way back that he's taking this young man out, because he's chasing him to bring him down, okay?" Ex. 4 at 232:6-9.

- "So I can't tell you when Mr. Rubald, you know, decided that I'm going to take this kid out, the exact moment he says that in his mind, I'm going to pull the trigger now and shoot this guy." *Id.* at 232:16-19.

- "This is somebody targeting somebody and taking him out…He's shooting at his back, and he got him." *Id.* at 239:9-13.

Opinions of this nature not only are unreliable for the reasons discussed above, but also lack any basis in the record.

## II. Larsen Should Be Barred from Offering Testimony Related to His Position Experiments.

Larsen also tried to determine the location and position of Winford's body when he was shot. "The reliability of an expert depends upon both the expert's qualifications and the methodology employed by that expert." *Ty, Inc. v. Publications Int'l, Ltd.*, 2004 WL 2359250, *5 (N.D.Ill. 2004) (Zagel, J.). Larsen's deposition testimony revealed that both his qualifications and his methodology fall beneath the bar of admissibility.

He first affixed a trajectory rod to a mannequin according to the bullet's estimated angle of impact. Ex. 2 at 7-8. Then he took the mannequin to the scene of the shooting, and "experimented" with the mannequin in four different positions "to show what is feasible versus what isn't feasible." *Id.* at 13-16; Ex. 4 at 203:5-8. Larsen considered (1) the position of the mannequin; (2) the position of the car; (3) that the shooter was in a fixed, seated position within the car; (4) that the shooter was left-handed; and (5) his calculation of the bullet's angle of impact. *Id.* at 202:8-205:24. For each position, all inputs and methods remained constant except for the mannequin's position. *Id.* at 206:3-5, 208:10-18. He then looked for where "those [trajectory] rods, those angles, all come together and work with a shooter." *Id.* at 206:12-207:4.

### A. Larsen's Method of Calculating the Bullet's Angle of Impact Is Unreliable.

Larsen's estimated angle of impact (the angle of a bullet's pre-impact flight path) is the cornerstone of his opinions about the position of Winford's body when the bullet struck it. Lacking requisite expertise in forensic pathology, Larsen used an incorrect method to determine the angle of impact.

a. **In the Context of a Human Body, Larsen Lacks the Expertise to Determine the Bullet's Angle of Impact.**

To give expert testimony, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Defendants do not challenge Larsen's expertise in bullet trajectory through non-human objects such as wood or glass. However, Larsen has no expertise in bullet trajectory through the human body. He has never testified as an expert to bullet trajectory within a human body; his past "expert opinions dealt with either windshields or other non-human-body objects." Ex. 4 at 275:3-276:17. Nonetheless, he claims his expertise in bullet trajectories through non-human objects makes him an expert on bullet trajectories through human bodies as well: "you got to lump it in there." *Id.* at 125:5-16.

Furthermore, Larsen admitted he lacks key expertise at his deposition. For example, he admittedly has never "actually [taught] how to figure out the bullet trajectory within a human body;" in fact, he "would never make the assumption that I'm going to do this on my own. I'd want to go to medical school first, you know." *Id.* at 276:18-279:1. When asked whether "hitting an organ [would] cause a change in the angle the bullet is traveling," he responded, "I can't answer that…That's way outside – I don't have that type of expertise." *Id.* at 119:16-21. That expertise is necessary: the bullet that killed Winford entered at the right 10th rib, and passed through different types of tissue (bone, organs, muscle, etc.) until it came to rest in the left pectoral muscle. *See* Autopsy Report at 2, attached as Exhibit 9. When asked whether it is possible that the bullet moved inside Winford's body during its transportations to and within the ambulance, hospital and morgue, Larsen again answered, "That's outside of my expertise." Ex. 4 at 163:12-165:9. Nor did he know whether, during an autopsy, the body of a shooting victim is laid out on an examination table or kept in the same position it was in when stuck by the bullet: "this is something you should be asking the medical examiner." *Id.* at 117:4-24.

Courts have excluded experts in similar situations. In *Gates v. City of Memphis*, the Sixth Circuit affirmed the exclusion of expert testimony with the same problem as Mr. Larsen's: "the testimony Mr. Stone was prepared to give was not a general shooting scene reconstruction…he was being offered to give testimony on the specific subject of trajectory analysis." 2000 WL 377343, *3 (6th Cir. 2000). "Given the focus of his proposed opinion testimony, it was not error for the court to consider his expertise in trajectory analysis, rather than his expertise in the general field of crime scene reconstruction." *Id.* Like Larsen, the excluded expert "had never received formal training in trajectory analysis," and "had no post-secondary education in physics, anatomy or physiology." *Id.* at *4.

**b. Larsen's Methodology Is Unreliable.**

Larsen's lack of expertise is further revealed by the unreliable method he used to calculate the bullet's angle of impact. Larsen relied solely on the wound path set forth in Dr. Jorden's autopsy report "to establish the estimated angle of impact of the bullet that was recovered in Winford." Ex. 2 at 3. He first placed a trajectory rod into a "simulated bullet hole entry" in the side of a mannequin, and then inserted the rod "in an upward right to left position with the head of the rod coming to rest in the left front pectoral muscle." *Id.* at 7. He then measured the angle of that trajectory rod to arrive at his estimated angle of impact for the bullet that struck Winford. *Id.* at 8.

Larsen deviated from accepted practice in his field by relying solely on Dr. Jorden's report. Practitioners in the field reject Larsen's method as "misleading":

> Exact calculation of the angle that the bullet traveled through the body is not possible. The results of such calculations are often misleading. At the time of autopsy, the body is in an unnatural position, e.g., flat on its back and not upright. Calculations of the angle fail to take into account movement of the thorax, diaphragm, and internal viscera during the normal processes of breathing; distention

> of the viscera by fluid, air or food; the effects of gravity on the position of the internal viscera; and bending and twisting of the body at the time of bullet impact.

Vincent J.M. Di Maio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* 290 (1985). "The pathologist's information and observations regarding each gunshot wound is the starting point but not necessarily the ending point." Haag, *supra*, at 193.

Furthermore, Larsen assumed the bullet traveled "a straight line trajectory within the body" from the entry wound to the terminus site. Ex. 4 at 155:20-156:6. This erroneous assumption is neither accepted in the field of shooting incident reconstruction, nor is it supported by the record. "A bullet that entered at point A and exited at point B may not necessarily have followed a straight line." Haag, *supra*, at 197. Projectiles penetrating bodies

> may follow straight paths, but since they are not moving through air, they may also deviate as they pass through tissue, organs, or other structures…This is a result of the varying densities and strengths of such tissues or organs and to the fact that bullets cannot maintain their spin stabilization in media other than air.

*Id.* at 191. Larsen admitted that Dr. Jorden "didn't say that the bullet traveled in a straight line within Mr. Winford's body," nor did she "articulate any direct angles." Ex. 4 at 161:21-162:2.

Larsen's methodology also fell short of acceptable practices in his field because he failed to examine and consider important evidence, such as clothing, autopsy X-rays and the bullet itself:

> The *clothing* from a gunshot victim should *always* be sought and examined when available…The nature of a bullet hole in clothing can reveal much regarding the bullet's pre-impact stability, its design, and whether it passes through some intermediate object prior to striking the victim. This information should be compared to the findings and observations of the pathologist regarding the entrance wound.

Haag, *supra*, at 197 (emphasis in original). "X-ray films of the decedent…can provide additional information regarding the bullet" such as struck or fractured bones. *Id.* "Examination of a bullet recovered from the body of a victim is also very useful in assessing its probable

behavior as it made its way to its final position of rest." *Id.* Larsen made none of these scientific examinations.

**B. Larsen's Positioning of the Car Has No Basis In The Record.**

"[T]he facts on which an expert bases his opinion must have some basis in the record." *Wells v. City of Chicago*, 2012 WL 116040, *11 (N.D.Ill. 2012) (Kennelly, J.). All four of Larsen's position experiments are inadmissible because Larsen appears to have positioned the Crown Victoria according to his own whims rather than by any evidence in the record.

For each position experiment, Larsen placed the car approximately 10-11 feet south of the gate, with its "front passenger window…almost perpendicular to the last garbage bin." Ex. 2 at 13, Photo Plate 17; Ex. 4 at 179:15-19. He incorrectly claims that the car "was positioned as described by POs Rubald and Romero." Ex. 2 at 14. However, Officer Romero testified that their squad car was "within five feet" and "approximately three to five feet" of Mr. Winford when he stopped. Romero Dep. at 74:15-18; 79:1-10 (attached as Exhibit 10). Officer Rubald testified Mr. Winford was "about five feet" away when he pointed the gun at Officer Rubald. Rubald Dep. at 50:9-17 (attached as Exhibit 11). Contrary to Larsen's claim, his placement of the car spans at least twice the distance indicated by the officers.

Furthermore, for the purposes of his position experiments, Larsen assumed the car was stationary. Ex. 4 at 246:8-10. There is no basis in the record for that assumption: no one testified about whether the car was moving when the shots were fired.

### C. The Mannequin's Positions Have No Basis in the Record.

In positioning the mannequin, Larsen again failed to fulfill the requirement that his opinions be based on facts in the record. For example, with regard to Position Experiment #1, Larsen admitted there is nothing "in the record in this case that suggests that this was the position in which Mr. Winford was when he was shot." Ex. 4 at 202:4-7. Similarly, he admitted he devised Position #3 without any basis for it in the record. *Id.* at 223:7-16. When asked the basis in the record for Position #4, Larsen replied, "Well, there wasn't any." *Id.* at 225:5-8.

Larsen claims Position #2 is based on the officers' deposition testimony and statements to their fellow officers, specifically: "P.O. Romero further related that WINFORD was on top of the fence, preparing to jump, and turned and pointed the gun at P.O. Rubald and himself;" and Officer Romero's deposition testimony that Winford "had climbed on top of the gate." Ex. 4 at 214:3-9, 217:16-218:4 (citing Ex. 1 at FCRL106), 220:21-221:5 (citing Ex. 10 at 83:5-11).[3] Position #2 has the mannequin standing completely upright "on top of the gate rail looking north." Ex. 2 at 14, Photo Plates 16 & 17. The officers' statements create no basis for the mannequin's straight up-and-down posture in Position #2.

### D. Positions No. 1, 2 & 3 Are Irrelevant Because Larsen Rejected Them As Possibilities.

Expert opinions must be not only reliable but also relevant: tending to make a material fact "more probable or less probable than it would be without the evidence." *Daubert*, 209 U.S. at 587; Fed. R. Evid. 401. Larsen rejected Positions #1-3 as possible explanations of the shooting. Ex. 2 at 13-15. These positions are strawmen of Larsen's invention; no witness or expert has ever claimed that any of these positions are what happened. Larsen's destruction of his own strawmen makes no fact more or less probable, and is thus irrelevant.

---

[3] Larsen also cites Officer Rubald's deposition transcript (Ex. 11 at 52:4-14), but the description therein of Winford "on top of the gate" is Mr. Staes', not Officer Rubald's. Ex. 4 at 218:15-219:15.

## III. Larsen Should Be Barred From Offering Opinions About the Officers' Credibility.

"[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury." *Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir.2000). Larsen offers his opinions of the officers' credibility, such as his opinion that the officers' "accounts of the shooting incident…were laced with partial truths and fabrications." Ex. 2 at 16. All such opinions touching on the credibility of the officers or their statements must be barred.

## IV. Larsen Should Be Barred From Offering Opinions Related to the Fence and Gate.

Larsen should also be barred from giving opinions about the ways in which Winford could or could not have navigated the fence and gate during the incident. To give an opinion, an expert must have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Larsen's purported expertise lies with shooting incident reconstruction, not with gate-jumping. He can offer no particular expertise on this topic, and thus cannot be helpful to the jury. Nor does a jury need guidance on this topic – gates are commonplace structures, and their navigation is well within a juror's experience and comprehension.

Furthermore, the method by which Larsen reached these opinions is unsound. Larsen reached his plausibility conclusions by (1) examining the gate; (2) trying to mount the gate himself, (3) having his 68-year old assistant mount the gate (using a stepladder) and try balancing and going over the gate. Ex. 4 at 249:6-16, 250:17-18, 254:21-255:3. The physical capabilities of Larsen and his assistant are not probative of a healthy teenager's physical capabilities. Larsen testified, "I'm not in great shape or anything": he "got shot up pretty bad in Vietnam," resulting in a foot drop rendering him 60% disabled. *Id.* at 255:4, 75:11-76:1. The

foot drop eventually necessitated Larsen's recent knee replacement. *Id.* at 18-20. Indeed, he "completely" agreed that 16-year-old Winford's ability to scale a gate would differ from his. *Id.* at 250:22-251:2. Larsen's many and varied opinions on the topic of the gate and fence are inadmissible and must be barred.

WHEREFORE, for the forgoing reasons, Defendants respectfully request that this Court bar the proposed expert testimony of John Larsen, and award any further relief it deems necessary and just.

Dated: June 14, 2013

Respectfully submitted,

/s/ Lindsay Wilson Gowin
Counsel for Defendants

30 N. LaSalle Street, Suite 900
Chicago, Illinois 60602
(312) 742-6423
(312) 744-6566 (FAX)
ARDC No. 6284270

**CERTIFICATE OF SERVICE**

I hereby certify that I have served this notice and the attached document to all counsel of record by causing it to be filed via ECF on June 14, 2013.

/s/ Lindsay Wilson Gowin