**IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA ARNOLD, individually and as Special Administrator of THE ESTATE OF MARTINEZ WINFORD, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 09 C 1617 |
| THE CITY OF CHICAGO, et. al., | ) | Judge Zagel |
| Defendants. | ) | |

## RESPONSE TO DEFENDANTS' RENEWED MOTION TO BAR TESTIMONY OF JOHN LARSEN

### Background and Procedural History

Martinez Winford was fatally shot by Chicago Police Officer Zachary Rubald on August 22, 2008 in the alley behind 651 E. 89th Street in Chicago. Rubald and his partner Officer Romero said they were in their patrol car following Mr. Winford, who ran down the alley until he reached the gate behind the residence at 651 E. 89th Street. They claimed that at this point, "all in one motion," Mr. Winford surmounted the gate and while atop it, spun around and pointed a gun down at them as they were sitting in their car essentially next to him. In response, Rubald said he rapidly fired twice, hitting Mr. Winford once, fatally.

John Larsen is a retired Special Agent of the FBI who has conducted, taught, and testified as an expert, about virtually every facet of crime and shooting scene investigation and reconstruction. Exh. 1, Larsen C.V. He conducted an exhaustive analysis of the shooting scene, taking into account, inter alia, the testimony of Defendants and the medical examiner.

Mr. Larsen's anticipated testimony involves two primary areas. First, that the position from which the officers claimed Rubald shot Mr. Winford is contradicted by the trajectory of the bullet path through Mr. Winford's body. Second, he will testify about the discovery of a bullet

hole through a garbage bin positioned *long before* the gate on which Mr. Winford was shot. The bullet hole was consistent with that of a firearm of the kind and caliber used by Rubald that night. This evidence supports the theory that Rubald shot at Mr. Winford while he was fleeing down the alley, well before reaching the gate on which he performed the acrobatics that Rubald claimed gave rise to the need to use lethal force in self-defense.

The instant motion is a reprise of Defendants' prior request to bar Mr. Larsen's testimony under Daubert, which had raised the same arguments--that Mr. Larsen's bullet hole/garbage bin opinions and those regarding the path of the bullet through Mr. Winford's body and its impeachment of the Defendants' stories, were insufficiently undergirded by expert qualifications and were otherwise unreliable and speculative. The Court rejected that motion after reviewing Mr. Larsen's detailed reports, thorough briefing by the parties, and according Defendants an evidentiary hearing at which Mr. Larsen testified. (Dkt. #95, 106).

The current motion adds nothing new, other than reliance upon Mr. Larsen's recent deposition, which defendants declined to take prior to the evidentiary Daubert hearing. Indeed, the March, 2013 deposition came nearly two years after the close of expert discovery (Dkt. #82). Thus, this motion is one for reconsideration. Such motions, however, "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence... [r]econsideration is not an appropriate forum for rehashing previously rejected arguments." Conditioned Ocular Enhancement v. Bonaventura, 458 F.Supp.2d 704, 707 (N.D.Ill. 2006)(Zagel, J.).

Motions to reconsider based upon "new" evidence require that the additional evidence "could not, through the exercise of due diligence, have been presented to the district court before" the decision asked to be reconsidered. Heft v. Moore, 351 F.3d 278, 282 n.1 (7th Cir. 1993). Choosing not to depose Mr. Larsen did not make his information previously unavailable for

purposes of the initial motion, any more than it made Defendants' efforts "diligent." Cf. Chamber of Commerce of U.S. v. N.L.R.B., 879 F.Supp.2d 18, 33 (D.D.C. 2012)("The newly presented facts about the electronic voting room were not previously unavailable. Defendant simply *chose* not to include them."). Indeed, Defendants' choice not to depose Mr. Larsen until two years after the close of expert discovery would have justified precluding the deposition at all. Kedzior v. Talman Home Fed. Sav., 1990 WL 70855 at *4 (N.D.Ill. 1990)("plaintiff's choice to wait until the eleventh hour to take important depositions is not sufficient cause to require this court to sua sponte reopen discovery"). Thus, the Motion should be denied without substantive consideration.

Even on the merits, the Motion fails. It essentially brands Mr. Larsen's testimony "speculative" because he did not account for other possibilities that themselves were inherently speculative, often preposterously so. Illustrative is the conjecture that perhaps the bullet-pierced garbage bin examined by Mr. Larsen was a different one than the bin at the scene in 2008 and, necessarily, that their identical serial number may have been pure coincidence. No less coincidence-dependent is the guess that perhaps the entry and exit bullet holes in the bin may have resulted from some other undocumented, unreported shooting at some other time and that that rank speculation is more reliable than the assumption that the holes were attributable to a known shooting at that very place where one of two undisputed shots is otherwise unaccounted for.

As for the damning, downward path of the entry and exit holes, Defendants say that maybe the holes came from different shots. Really. Under this scenario, there are actually two more shots at this precise location than any evidence would support, each coming from a different direction and each, coincidentally, involving only an entry hole with no exit - a stunning impotence for projectiles traveling as much as 3,000 feet per second through plastic and otherwise capable of permeating walls. This same speculative thesis undergirds the challenge to Mr. Larsen's

assumption of a straight bullet path through Mr. Winford's body, because it did not account for the possibility of the steaming bullet's course being altered by *soft tissue*.

The Supreme Court has taken a dim view of challenges to experts that themselves "require a good deal of speculation." Kansas v. Colorado, 533 U.S. 1, 18-19 (2001). Mr. Winford's family has waited five years for this case to be aired. The Motion should be denied. The expiration of expert discovery more than two years ago should be honored. And the case should be set for trial.

**Argument**

F.R.E. Rule 702 provides that an expert, if qualified, may provide helpful testimony if "based upon sufficient facts or data" and is "the product or reliable principles and methods." Fed.R.Evid. 702. Accord United States v. Cruz-Velasco, 224 F.3d 654, 660 (7th Cir. 2000). Under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589-93 (1993), courts seek to ensure that expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Jenkins v. Bartlett, 487 F.3d 482, 488-89 (7th Cir. 2007). Under the Daubert framework, a district court must determine whether (1) Mr. Larsen would testify to valid scientific, technical, or other specialized knowledge and (2) whether his testimony will assist the trier of fact. Ammons v. Aramark Uniform Svs., Inc., 368 F.3d 809, 816 (7th Cir. 2004).

Here, Mr. Larsen performed a reconstruction of the shooting incident based upon the application of science and his thirty-plus years experience in the field to compare the physical evidence with the accounts of the officers. Part of Mr. Larsen's efforts was his analysis of the two bullets fired by Rubald. Motion, Ex. 2 at p.3. First, based on relative locations of Mr. Winford and Rubald and the angle of the wound path caused by Rubald's bullet, Mr. Larsen opines that Mr. Winford could not have been in a position to point a firearm at the officers at the time he was shot in his side towards his back. Motion, Ex. 2 at p. 13-18, Ex. 4 at p. 249. Second, Mr. Larsen opines

that Rubald's first shot occurred when Mr. Winford was running down the alley (Motion, Ex. 2 at pp.16-17, Ex. 4 at p. 305) based upon (1) the absence of any bullet or impact site in the wall behind Mr. Winford (Motion, Ex. 2 at p. 7, Ex.4 at pp. 29-30, 240) and (2) the presence of a bullet path through a garbage bin in the alley, the size of which is consistent with Rubald's bullets and the trajectory of which is consistent with coming from Rubald as his car was pursuing Mr. Winford down the alley. Motion, Ex.2 at pp. 9-12, 17-18, Ex. 3, Ex. 4 at pp. 290-91).

### I. Mr. Larsen's Testimony That Mr. Winford Could Not Have Been Pointing A Firearm At The Officers When He Was Shot Is Admissible

Focusing on Rubald's shot that killed Mr. Winford, Mr. Larsen sought to determine the location and position of Rubald and Mr. Winford at the time of the shot. He first calculated the vertical and horizontal estimated angles of impact of the bullet through Mr. Winford's body using the Report of Postmortem Examination written by Dr. Jorden, finding them to be 22 degrees +/- 7 and 40 degrees +/- 7 respectively. Motion, Ex. 2 at 5. Having determined the bullet's trajectory, he inserted a corresponding trajectory rod into a mannequin of similar build to Winford. Id. at 7-8.

Mr. Larsen then performed four experiments using the mannequin in different positions. Using the accounts of Rubald and Romero, he positioned his assistant, of similar size to Rubald, in a vehicle of the same make as Rubald's, with the vehicle's front passenger window almost perpendicular to the last garbage bin in the alley before the gate and 3 feet to the east of the westernmost garbage bins: approximately 10 feet from the gate. Motion, Ex.2 at pp. 9, 12-14, 17, Ex. 4 at p. 179. Mr. Larsen then placed the mannequin in three different positions relative to the gate and the vehicle to demonstrate the interplay between the trajectory of the bullet and the position of Mr. Winford's body, and he determined that none fit his trajectory analysis. Motion, Ex. 2 at pp. 13-15. He observed that it is unlikely, if not impossible, for Mr. Winford to have been standing on top of the gate as it "does not afford a stable fixed platform to accommodate a body

standing on top of it" and that the momentum of a body attempting to surmount the gate would prevent it from doing anything "but trying to clear the top of the gate rail" since the "chest area weight" forces the body forward. Id. at p. 14.

In his fourth position experiment, Mr. Larsen positioned the mannequin as if it was "attempting to vault and/or roll (dive) over the top rail of the gate," the only position in which the horizontal and vertical angles of impact "closely correspond" with Rubald's position in his vehicle. Id. at pp. 15-16. In this position, however, Mr. Larsen concludes that "the mannequin cannot turn towards the officers to fire a shot as they have testified." Id. at p. 16.

Defendants do not argue that Mr. Larsen's observations and experiments compel a different conclusion or that his experiments or conclusions are contradicted by any physical evidence. Nor do they contend they are irrelevant or that they would not assist the jury. Rather, they incorrectly argue that Mr. Larsen is unqualified to offer his opinions and quibble with his methodology.

**A. Estimated Angles of Impact**

First, Defendants claim that Mr. Larsen is unqualified to have determined the vertical and horizontal estimated angles of impact of the bullet through Mr. Winford's body because he "has no expertise in bullet trajectory through the human body" since he has never before testified as an expert in bullet trajectory through a body, rather than through inanimate objects, a subject on which he has testified. Motion at 12-13. However, Mr. Larsen's extensive bullet trajectory analysis education and experience qualify him. See infra at p. 9. As he put it:

> Q. Okay. So is it fair to say that your expertise is with bullet trajectories through objects as opposed to the human body?
>
> A. The Human body is an object.
>
> Q. Okay. So you would consider yourself to be an expert in bullet trajectory through human bodies as well?

A. Well, yeah.

Motion, Ex.4 at p. 125. Moreover, that Mr. Larsen has not testified in court regarding bullet trajectory in a body does not disqualify him from doing so in conjunction with a medical description of the bullet's path given his training and experience. Lucien C. Haag, Shooting Incident Reconstruction (Academic Press 2006), relied upon by Defendants, refutes their position. Mr. Haag notes that a number of sources and methods are available to estimate a bullet's path in a gunshot victim, including a "medical examiner's description." Haag, Shooting Incident Reconstruction at p. 181. Recognizing that most forensic pathologists are "loath" to commit to numerical angles, Mr. Haag recommends using, if available, a detailed description of the wound path created by the pathologist to calculate the bullet trajectory. Id. at 181-82. Mr. Haag cautions, however, that an uncertainty of +/- 5 degrees to +/- 10 degrees for wound paths is appropriate. Id. at p. 182. Here, Mr. Larsen used Dr. Jorden's detailed wound path description to calculate the bullet trajectory through Mr. Winford's body, assigning a margin of error of +/- 7 degrees. Motion, Ex. 2 at p.5. Consequently, his methodology falls squarely within that recommended by Mr. Haag.

Mr. Larsen concedes, as does Mr. Haag, that he is not qualified to determine the *path* of a bullet through a human body *en vacuo*. Motion, Ex. 4 at 276-78. He is, however, qualified to determine the *trajectory* of the bullet with the aid of a medical examiner who has determined the bullet's path, as is the case here.[1] And Mr. Larsen did not state that his teaching has never included bullet trajectory through a human body (Motion at 12). Rather, in discussing his bullet trajectory reconstruction class, he explains that investigators base their opinion on doctor, pathologist, and medical examiner reports. Motion, Ex. 4 at 277-78. Whether the bullet in Mr. Winford moved

[1] Motion, Ex. 4 at 125, 277-78; Haag, Shooting Incident Reconstruction at 181-82; Bennett and Hess, Criminal Investigation (8th ed., Thompson Learning 2007) at p. 250("the angle of trajectory can be determined from the bullet's path through the body"); Deering v. Reich, 183 F.3d 645, 654 (7th Cir. 1999)(proper to allow testimony from forensic pathologist that "by looking at a wound track, one can determine the relative positions of the parties").

during transport or whether his body position was preserved (Motion at 12) might be relevant to Mr. Larsen's opinions had either been noted in a report. They were not. Mr. Larsen's qualification does not hinge upon knowing the unknowable, lest no expert ever be qualified. Defendants point to no physical evidence that disproves his opinions or even calls them into question.

Gates v. City of Memphis, 2000 WL 377343 (6th Cir. 2000)(Motion 13) is inapposite. There, a former police officer who "also participated in the reconstruction of shooting incidents" and who took "a number of courses and training seminars on crime scene investigation" was offered as an expert on "trajectory analysis" regarding "the probability of threat" to an officer. Id., *3. Noting that the proposed subject of the expert's testimony was trajectory analysis and not a "general shooting scene reconstruction," the court affirmed exclusion of his proposed testimony "in light of the fact" that the expert (1) "had never received formal training in trajectory analysis"; (2) had no post- secondary education in physics, anatomy or physiology; and (3) "had made no measurements, and had done no scientific testing on [the] particular shooting scene." Id. *4.

Mr. Larsen, by contrast, as a member of the F.B.I. from 1981 to 2003, including a posting as Coordinator & Senior Evidence Response Team Leader of the F.B.I.'s Chicago Division, received extensive and specialized training and on-the-job experience in crime scene reconstruction and its discrete sub-topics. See Ex. 1. Contrary to Defendants' assertion that like the excluded expert in Gates, Mr. Larsen "had never received formal training in trajectory analysis" (Motion at p. 13), Mr. Larsen attended the F.B.I.'s "Bullet Trajectory Reconstruction School" (Ex.1 at p. 3) in addition to receiving substantial and broad-based training from the F.B.I. which undoubtedly encompassed ballistics, trajectory analysis, physics, anatomy and physiology. (See Ex. 1 at pp. 2-4). Indeed, Mr. Larsen is so well-versed in trajectory analysis that in 1997 he directed an all-day training exercise for the F.B.I. Chicago Division's Evidence Response Team in

"Trajectory Studies." Id. at p. 3. Moreover, after retiring from the FBI, he taught 14 "trajectory reconstruction" classes at the Suburban Law Enforcement Academy. Motion, Ex. 4 at 276-77. Lastly, and again unlike the excluded expert in Gates, Mr. Larsen took comprehensive measurements and performed scientific testing on the shooting scene specifically related to his opinion regarding estimated angle of impact of the bullet found in Mr. Winford's body. Motion, Ex. 2 at 1-8. Far from supporting exclusion of Mr. Larsen's proposed testimony regarding the estimated angle of impact, Gates confirms his qualifications to perform his trajectory analysis.

Next, Defendants label as "unreliable" Mr. Larsen's calculation of the estimated vertical and horizontal estimated angles of impact based upon Dr. Jordan's Report of Postmortem Examination. Motion at pp. 13-15. But they offer no contrary calculations or even any known variables that Mr. Larsen failed to consider. Rather, they argue for inadmissibility based upon the possible effect of unknown variables, conceding that "[e]xact calculation of the angle that the bullet traveled through the body is not possible." Motion at p. 13. Accordingly, in line with the practice of his peers (Mr. Haag, supra), Mr. Larsen assigned an error rate to his calculations of +/- seven degrees on both the vertical and horizontal. Compare Schnur v. Kohl's Department Store, 2010 WL 4930687 *2 (N.D.Ill. November 29, 2010(Zagel, J.)("the precise measurement of the deviations is not essential to [the expert's] conclusions, anyway, as he indicated in his deposition that they would be the same for any deviation greater than 1/4 inch").

Moreover, according to Defendants, that Mr. Larsen assumed a straight line from the entrance wound of the bullet to where it eventually came to rest makes his calculation "unsupported by the record" and an "erroneous assumption" unacceptable in the field because the bullet did not necessarily travel in a straight line. Motion at p. 14. According to Mr. Haag:

> "Projectiles penetrating or perforating bodies travel over *very* short distances...and *may* follow straight paths but since they are not

> moving through air, they may also deviate as they pass through tissue, organs, or other structures. Impacts with bone also increase the likelihood of deflection."

Haag, Shooting Incident Reconstruction at p. 177. However, Dr. Jorden noted *no* chipped or broken bones, much less any caused by the bullet[2], nor did she even hint that the bullet travelled in anything other than a straight path. Thus, it was not unreasonable to assume a bullet that apparently struck no bone, travelling between 1400 and 2900 feet per second, followed a straight path. Motion, Ex. 4 at p. 91. Indeed, "[p]istol bullets tend to follow straight paths in tissue" unless destabilized by some intermediate impact or asymmetrically deformed during tissue penetration. Haag, supra, at p. 177. Defendants point to no evidence that Rubald's bullet hit an intermediate object or was asymmetrically deformed during bullet penetration.

Nor does Mr. Larsen's "fail[ure]" to examine clothing, autopsy x-rays and the bullet found in Mr. Winford make his opinion unreliable or inadmissible. Motion at pp. 14-15. Defendants do not claim that the examination of these items would lead to a different conclusion than Mr. Larsen's. Nor do they explain why an examination of Mr. Winford's clothing could lead to a different result. Indeed, the bullet's design is known and there is no indication it hit something before it hit Mr. Winford. Cloth does not alter the course of a high speed bullet. And it is unnecessary to examine any x-rays where Dr. Jorden noted no broken bones after examining them herself. Motion, Ex. 9 at p. 3. Lastly, there is no evidence that the bullet was deformed. If it was, defendants would point to it, since the reports reflect *their* possession of it.

In short, Mr. Larsen's trajectory analysis tracked Dr. Jorden's conclusions and is consistent with them. He "start[ed] from...reasonable estimates from the information available." See Lapsley v. Xtek, Inc., 2012 WL 3055865 * 9 (7th Cir. July 27, 2012). Nothing in Daubert makes unreliable

[2] While Defendants state that "the bullet that killed Winford entered at the right 10th rib, and passed through different types of tissue (bone, organs, muscles, etc.)" (Motion at 12), Dr. Jorden's report does *not* state that the bullet impacted

the fact that his methodology did not include theoretical evidence the medical examiner could not support, and the actual impact of which the defendants have carefully refrained from discussing, other than the *ipse dixit* that it "perhaps" might be significant. Mr. Larsen was not required to make adjustments to take into account *every* slight deviation in order to exclude all other theoretical possibilities - none of which defendants can say would change anything. See McCall v. Skyland Grain, LLC, 2010 WL 2543574 *4 ("an expert is not required to exclude each and every possible alternative cause before such an approach is considered reliable" under Daubert).

Even if Defendants offered *evidence* to contradict Mr. Larsen, it would not bar his testimony, even if he did not consider it. See Schnur, 2010 WL 4930687 *2 (it "does not matter that there is other evidence which [the expert] did not review that contradicts his assumption. Defendant is free to submit evidence contradicting the underpinnings of the report, which may affect the consideration and weight given [the expert's] conclusions").

**B. Rubald's Position**

Defendants next argue that Mr. Larsen's positioning of the Officers' simulated vehicle in his experiments is unsupported by the record. Motion at p. 15. For each position experiment, Mr. Larsen placed the vehicle with the vehicle's front passenger window "almost perpendicular to the last garbage bin" in the alley before the gate and 3 feet to the east of the westernmost garbage bins: approximately 10 feet from the gate. Motion, Ex.2 at pp. 9, 12-14, 17, Ex. 4 at p. 179.

The day after the incident, on August 23, 2008, Rubald drafted a Tactical Response Report, which stated that the distance between him and Mr. Winford was ten to fifteen feet when he discharged his weapon. Ex. 2. By the time of his deposition on December 1, 2009, however, the distance had changed to five feet. Ex. 3 at p. 50. Romero's recollection was even more malleable on December 1, 2009. He first recalled the distance as "maybe five or ten feet." Ex. 4 at 74. Soon

---

or passed through any bones. See Motion at Ex. 9.

thereafter, he changed his answer to "within five feet." Id. Finally, forgetting what he had already said, Romero testified that the distance was "[l]ike I said, approximately three to five feet." Id. at 79. Thus, Mr. Larsen's positioning of the vehicle approximately ten feet from the mannequin fell squarely within the Officers' variable recollections of anywhere from three to fifteen feet.

As to Mr. Winford's position relative to the vehicle, Rubald testified that Mr. Winford was never perpendicular to him, but was always a little bit ahead of the vehicle (i.e. "always right in front of me") Ex. 3 at p. 49. But Romero said that Mr. Winford " was right in front of our window," agreeing that Mr. Winford was perpendicular to the vehicle. Ex. 4 at p. 78. Thus, Mr. Larsen's positioning of the vehicle corresponds with Officer Rubald's description, with the vehicle positioned in-between the last garbage bin and the gate. See Motion, Ex. 2 at p. 12.

Defendants offer no evidence or even supposition that a slight change in the position of the vehicle would dictate a different conclusion. Nor do they argue that Mr. Larsen's use of a stationary vehicle rather than a moving one in his experiments impacted his conclusions in any way. Motion at p. 15. Again, Mr. Larsen "start[ed] from...reasonable estimates from the information available" (See Lapsley, supra, 2012 WL 3055865 * 9) and assigned a +/- seven degree margin of error. Defendants were free to counter Mr. Larsen's assumptions with rebuttal testimony and cross-examination. They offer none.

### C. The Gate

Defendants argue that Mr. Larsen should be barred from making observations about the gate atop which Mr. Winford was shot. Motion at p. 17-18. He observed that "the gate is a precarious perch that leans into the backyard" and that the wire hoops near the top of the gate "visibly appear to have been worn down by age and use. Motion, Ex. 2 at p. 16. Because the gate was precarious as a perch, Mr. Larsen found that it takes two hands to surmount it. Id.

Accordingly, it is unlikely if not impossible for Mr. Winford to have been standing on top of the gate as it "does not afford a stable fixed platform to accommodate a body standing on top of it" and the momentum of a body attempting to surmount the gate would prevent it from doing anything "but trying to clear the top of the gate rail" since the "chest area weight" forces the body forward. Id. at p. 14. As Defendants concede, Mr. Larsen's stem from examining the gate and attempting to mount the gate himself. Motion at 17. Like Mr. Larsen's measurements of the gate's height (Motion, Ex. 2 at p.7) and his other observations not requiring particular expertise or knowledge, however, his observations about the gate are not expert testimony and thus do not implicate Rule 701. Blameuser v. Hasenfang, 345 Fed.Appx. 184, 187 (7th Cir. 2009)(treating physician not considered an expert witness if testifying about observations based on personal knowledge); Rodrick v. Wal-Mart Stores East, L.P., 666 F.3d 1093, 1096-97 (8th Cir. 2012)(allowing expert to testify concerning "personal observations" contained in expert report because subject to rebuttal by witnesses and cross- examination); U.S. v. Gonzalez, 470 Fed.Appx. 2, 5-6 (2nd Cir. 2012)(not expert testimony, and thus Rule 701 not implicated where testimony limited to "facts the witness personally observed").

Defendants have not disputed Mr. Larsen's observations, and they were free to introduce a rebuttal witness and to cross-examine him on the subject. They did not. Moreover, without Mr. Larsen's testimony, the jurors will be left in the dark concerning the gate's physical characteristics unless they visits the scene and observe the gate themselves, which we request they be allowed to do. Accordingly, Mr. Larsen's observations concerning the gate are admissible because they are relevant. Further, even if deemed expert testimony, Mr. Larsen's observations will obviously assist the trier of fact.

**D. Mannequin Positions**

Defendants argue that Mr. Larsen's four mannequin positions are factually unsupportable and further that the first three are irrelevant, because he found them to be impossible. Motion at pp. 16-17. In position number 1, Mr. Larsen placed the mannequin standing in front of, rather than on top of, the gate in order to demonstrate the result of an incorrect vertical angle (i.e. Rubald would have to have been laying on the ground). Motion, Ex. 2. at p. 13. In position 2, Mr. Larsen positioned the mannequin "standing partially bent forward on top of the gate rail looking north" in order to demonstrate the result of an incorrect horizontal angle (i.e. Rubald would have had to have been farther back down the alley) as well as the physical properties of the gate itself (see supra at Section I(C)). Motion, Ex. 2 at p. 14. In position 3, Mr. Larsen positioned the mannequin on top of the gate with its chest facing the Officers' simulated vehicle in order to demonstrate the opposite effect of an incorrect horizontal angle vis-á-vis position number 2 (i.e. Rubald would have to have been to the southwest of the gate - past the garage). Id. at pp. 14-15. Finally, in position number 4, the mannequin was "positioned as if attempted to vault and/or roll (dive) over" the gate. Id. at p. 15.

Because Mr. Larsen's unrebutted trajectory analysis was reasonable, Defendants' attempt to bar his resulting conclusions concerning Mr. Winford's possible body positions when shot, predicated upon that trajectory analysis, necessarily fails. Positions one through three are demonstrative of the principles behind trajectory analysis and thus relevant to assist the trier of fact. Nor is Motion furthered by the claim that Mr. Larsen's experiments inaccurately had the mannequin standing on top of the gate. Motion at p. 16. Contrary to the contention that the Officers never placed Mr. Winford standing on top of the gate, this is exactly what they said, among other things:

> Q: Okay. So he starts to climb this gate, as I understand it?

A: He is going over the gate.

Q: Okay. And what happens *when he gets to the top of the gate?*

A: Well, I observe him with the handgun pointed in my direction.

Q: Okay. Doe he-is it that he gets *on top of the gate,* and then turns to point-

A: It's all in one motion. It's very fast.

Q: Okay. Let's try to take it slow. I understand that it occurred quickly, but I want you to describe the motion as best you can. When does-is there ever a point when he begins to turn back towards you to point that gun?

A: When he goes over the fence, he is facing-he has got his body on an angle towards me. He has got his gun pointed towards me.

Q: Okay. So he is *on top of the fence.* He has got his body turned back towards you, and he is pointing a gun at you?

A. Yes.

***

Q: Do you remember if his motion was such that he was going to lift himself and hop over the fence, or was he going to-was he climbing over it?

A: He was not climbing over it.

Q: So he had-well, was it one motion that he kind of lifted himself up *on top of the gate?*

A: *Yes.*

* * *

Q: He then, when he is *on top of this gate* points, back at you. Points his gun at you. How long was his gun pointed at you before you fired.

A: I fired immediately as soon as I saw the gun pointed at me.

* * *

Q: Okay, could you tell when he *was on top of that gate* if you had hit him?

A: I wasn't sure if I had hit him or not.

Ex. 3 at pp. 49-52 (emphasis supplied). In a later deposition given to the City's Independent Police Review Authority, Rubald was adamant about it:

FRANKO: How high did he get on the fence?

RUBALD: He's at the top of the fence.

* * *

RUBALD: He pointed the gun back towards me.

FRANKO: As he's on top of the fence.

RUBALD: Yes. He didn't climb up the fence, he jumped.

Ex.5 at FCRL 002760. Romero also placed Mr. Winford on top of the gate. He most assuredly did not deny it:

A: I mean he was just *at the top,* and that is when he pointed the gun. And that is when my partner fires.

Q: Okay. We will get there. But he gets somehow *on top of the gate?*

A: Yes.

Q: All right. And *were both his feet on top of the gate or just one of them?*

A: I am not sure. It happened fast.

* * *

Q: Do you remember when he got *on top of the gate, was he standing?* Was he crouching?

A: Not sure.

Q: Was the gate between his legs?

A: I am not sure.

* * *

Q: Was he *on top of the fence*-that is where we left off. He was *on top of the fence,* pointing at Officer Rubald, correct?

A: Yes.

Ex. 4 at pp. 82-87 (emphasis supplied).

If, as the Motion hints (with no evidentiary support), Mr. Winford was on top of the gate, but not "standing" on it, this would suggest that he was suspended in the air above the gate. For there are only two reasonable possibilities for being on top of the gate - you're either *on* it, or above it[3]. The Motion does not explain, however, how this slight difference in altitude would change the trajectory analysis. Both prospects were impossible given the trajectory of the bullet.

Defendants also offered an alternative version in which Mr. Winford's feet were neither standing on the gate nor suspended above it. But this too was impossible. In this account, Defendants had no idea *where* Mr. Winford' s feet were or where they went. In this variation, Mr. Winford started by "planting" his left hand on the fence (see Ex. 4 at p. 80) and did not hurdle it as Rubald stressed, as he tried to "imagine" what happened:

Q: Did he hurdle it?

A: No. He put his hand on the fence - -

Q: Which hand did he put on the fence?

A: His left hand. And I would imagine he is hopping over it. I couldn't tell you exactly because I am coming at him [sic] a

[3] There was no evidentiary support for any other alternatives. Romero could not say that Mr. Winford was "crouching" on the gate (Ex. 4 at p. 52), and Rubald never did. The less than three-feet wide gate was too small for that in any event. See Motion, Ex. 2 at p. 7. Nor did either say Mr. Winford's stomach, back, or side were on the gate, as might be the case if he were rolling over it - which they never claimed - versus "jumping" over it, as they did.

pretty decent speed.

Ex. 3 at p. 47. Neither officer, however, could remotely explain how this occurred. Thus, neither could speak to the simple movement that necessarily would have followed the hand planting, namely the swinging of the legs/feet over the fence. Neither could say where his feet went or even if they went to the right or the left Ex. 3 at p. 50; Ex. 4 at p. 81. *Either* direction disproved their story.

If, after planting with his left hand, Mr. Winford somehow swung his feet to the left, he could never have gone over the gate, as can be seen by the picture at page 7 of Mr. Larsen's report. Motion, Ex. 2. at p.7. And one never would have done this if the goal was to actually go over the gate, since this movement prevented it. And if the goal was not to go over the gate and to instead wheel around and shoot, there was no need to plant a hand on the gate or to go airborne at all.

Conversely, if the intent was to surmount the gate, the only natural movement over it after planting with his left hand would have been to swing his feet to the right and upwards over the fence. But this would have kept Mr. Winford' s back to the officers and prevented his twisting backward toward them to point the gun at them as they claimed. The only other possibility is that his feet went directly beneath his body, but leaving aside how that could have occurred, it too would have prevented the mid-air spin backwards to face the Officers. And in each of these scenarios, Mr. Winford's forward momentum would have prevented the twist backward. As Mr. Larsen put it, Mr. Winford would be "moving forward and...his momentum would keep him from doing anything but trying to clear the top of the gate." Motion, Ex. 2 at p. 14.

Thus, the Officers' internally inconsistent accounts that variously put Mr. Winford atop the fence or planting a hand to propel his feet over it were refuted by the evidence, to say nothing

of impossible. Little wonder neither could provide any details of how this actually occurred.

Lastly, Defendants claim that position number 4 has no basis in the record. Motion at p. 16. This assertion simply ignores Mr. Larsen's deposition testimony that it was "the only one where I found that all your angles match or correspond with the shooter platform we have and the officer firing a shot out the window." Motion, Ex. 4 at p. 227. Rule 702 allows an expert to base their testimony on "sufficient facts or data":

> The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence. When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

2000 Advisory Committee Notes to Fed.R.Evid. 702. Consequently, that the physical evidence rather than the Officers' testimony supports position number four does not bar its admission.

In sum, Mr. Larsen's opinion cannot be excluded because it did not credit *non-viable* alternatives which Defendants themselves did not and could not support. Lapsley, supra, 2012 WL 3055865 at *9 (expert's conclusion properly "based in large part on [his] conclusion that there was no other viable explanation"). Unlike these impossible theories, Mr. Larsen's conclusion that Mr. Winford dove over the fence was consistent with the bullet trajectory as well as inertia. Diving over the fence was consistent with one other thing - the panic that would have ensued from just having been *shot at* as discussed in Section II below. Thus, Mr. Larsen's "hypothesis was reliably supported and applied to the known facts, such that it rises above speculation and becomes a presentable probability." Id.

### E. Opinions That Contradict The Officers' Accounts

Finally, Defendants claim that Mr. Larsen's expert opinion improperly attacks the Officers'

credibility and improperly notes the admitted inconsistency of their testimony, inter se. Motion at p. 17. Like any other expert, Mr. Larsen is charged with analyzing the available evidence, which here includes the Officers' statements. By noting testimonial inconsistencies, he has done no more than note inconsistencies in the evidence. Had he not, he might be vulnerable on cross-examination to not having considered one version or another. Or, he could be said to have tacitly *credited* one version over its inconsistent counterpart.

Mr. Larsen will not testify that defendants "lied," or were not "believable" unless that testimony is invited on cross-examination - e.g. "you don't think the officer was lying about that," "you're not questioning their truthfulness, are you?," or "you believe police officers are truthful don't you?," etc. That is not to say, however, that Mr. Larsen will not offer conclusions which, if accepted, might disprove the accounts given by the Officers, and, in turn, challenge their credibility. If an expert was limited to giving testimony that was harmonious with the other side's account, no expert would ever testify.

## II. Rubald's First Shot Occurred When Mr. Winford Was Running Down The Alley

The second facet of Mr. Larsen's testimony deals with an entry and exit bullet hole discovered in a garbage bin located well *before* the gate on top of which Defendants claimed Mr. Winford was positioned when he was shot. Motion, Ex. 2 at pp. 9-12. Mr. Larsen will testify that the garbage bin holes were caused by a bullet travelling on a downward trajectory consistent with having been fired from a vehicle located well to the east of the gate; a shot fired *before* the Officers' vehicle or Mr. Winford reached the gate on top of which Mr. Winford was fatally shot. Id.

Rubald testified that as they pursued Mr. Winford down the alley, Mr. Winford was "always a little bit ahead of [them]," "five feet or so." Ex. 3 at pp. 44-49; Motion at p. 9. The

pictures at page 6 of Mr. Larsen's report make clear that if the bullet hole in the garbage can was caused by Rubald, neither the Officers nor Mr. Winford had reached the gate by the time of this shot. Motion, Ex. 2 at p. 6. This fact, coupled with the indisputably *downward* trajectory of the holes through the garbage bin (as opposed to a shot *upward* at Mr. Winford atop a gate *above* Rubald) and the size of the bullet holes being consistent with those caused by the ammunition Rubald was using the night of the incident (Motion, Ex. 2 at p. 9, Ex. 3), prove that Rubald first fired at Mr. Winford while he was running down the street *away from* the Officers. Mr. Winford was not, as Rubald ridiculously claimed, whirling around atop a flimsy gate to attempt a carnival-like backward shot at the officers with his weak hand. "In short, [the officers] lied." Cf. Ienco v. City of Chicago, 286 F.3d 994, 996 (7th Cir. 2002).

Defendants challenge Mr. Larsen on two grounds here, namely whether the holes in the garbage bin were in fact were bullet holes, and if so, whether they were caused by Rubald on August 22, 2008 rather than by someone else at some other time. Motion at pp. 2-10.

### A. The Bullet Holes In The Garbage Bin

As to Mr. Larsen's conclusion that these were indeed bullet holes, Defendants incorrectly argue that Mr. Larsen's opinion lacks a foundation for his opinion, which is moreover claimed to be unreliable, despite his experience in such matters and the test he performed. Motion at pp. 7-8.

In discussing the identification of bullet holes, Mr. Haag notes that "[w]ith training and experience, the physical properties of bullet holes and bullet impact sites in most materials are readily distinguishable from defects produced by other objects." Haag, Shooting Incident Reconstruction at p. 39. While the examiner "*may* need to carry out some empirical testing in order to satisfy himself," "[t]he characteristic damage to an impacted surface produced by a bullet should be relatively easy to discriminate from impacts by other objects such as stones, debris,

irregular fragments from explosive devices, etc." Id. at p. 33 (emphasis supplied). Here, Defendants do not dispute that Mr. Larsen has the requisite training and experience given his CV's inclusion of "Bullet Trajectory Reconstruction," "Ballistic Field Training," and "testifying] as an expert in shooting incident reconstruction pertaining to a bullet hole." See Ex. 1.

After examining the holes with a magnifying glass (Motion, Ex. 2 at p. 293), consistent with being caused by a bullet, Mr. Larsen noted that both holes had a "crater effect" on their outside edges, rolling outward in the direction the bullet was travelling. Id. at p. 294. He determined that both holes were caused by the same bullet given the softness of the plastic they went through relative to the high velocity with which a bullet is expelled from a weapon. Id. at pp. 297-98. Thus, "though experience" Mr. Larsen determined that the holes were indeed caused by a single bullet. Id. at p. 294. He also performed an experiment by using the same type of gun and ammunition used by Officer Rubald to shoot a similar garbage bin. See Motion, Ex. 3. After comparing the diameter of the entry hole in alley garbage with the diameter of the entry hole in bin used in the experiment, Mr. Larsen found them to be "almost identical," leading him to conclude that both were "the result of a bullet and that the caliber of the bullets was similar." Id. at p. 2.

"[T]he test of reliability is flexible when examining an expert's technical knowledge and the techniques he employs." NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776, 788 (7th Cir. 2000). An expert's "work experience" in a legitimate field standing alone can sometimes confer "sufficient[] reliab[ility]" to his or her opinion." Id. at 789 (witness's twenty years of experience working in area of photographic interpretation made opinion sufficiently reliable). Accord U.S. v. Brumley, 217 F.3d 905, 911-12 (7th Cir. 2000)(witness's seven years of experience working as investigator gave his opinion sufficient indicia of reliability even though it was not based upon an

underlying methodology). Brumley stressed that even where another expert disagrees with an expert opinion "the disagreement does not render the opinion inadmissible." Id. at 911-912. Rather, the party seeking to bar the expert testimony "was entitled to cross-examine" the expert and to "put on his own expert to offer a counter opinion." Id. at 912. These adversarial entitlements combined with Kumho's teaching "that the reliability of different kinds of expertise may be shown in different ways" dispelled the argument that the expert's opinion "was not based on any professionally sound or reliable underlying methodology" because the opinion was based on "extensive investigative experience" Id. Here, Mr. Larsen's opinions were not only based on his extensive experience in the field, but were also based on his explicated examination of the holes' characteristics and experimentation to confirm his hypothesis.

Defendants argue however, that Mr. Larsen's opinion is "speculative" because: (1) despite the fact that the holes were consistent having been caused by a 9mm bullet, he could not rule out the possibility that they could have been caused by a similar caliber (Motion at p. 7); (2) it is allegedly "possible" that the holes were caused by not one, but two different bullets (id.); (3) he did not take into account the possibility that there was a cinder block in the garbage bin when it was shot (Motion at p. 7, Ex.2 at p. 29 ); and (4) that he did not test for "bullet wipe" (Motion at p. 8).

However, under Daubert and Rule 702, the court must refrain from "evaluating the credibility of competing scientific sources" and instead "ensure that the expert employed scientifically valid methodologies." Lakie v. SmithKline Beecham, 965 F.Supp. 49, 54 (D.C.C. 1997). And it is "crucial" here to recall the "distinction between the *admissibility* of expert scientific testimony and the *weight* such testimony should be afforded." Id. at 55 (emphasis in original). Thus, in Lakie, where a hematology expert employed a differential diagnosis grounded

in the scientific method to render an opinion on disease causation, it was not fatal to admissibility that the expert could not "eliminate each and every possible alternative cause" of the medical condition at issue where "general causation" had been established. Id. at 57. In Gonzalez-Perez v. Gomez-Aguila, 296 F.Supp.2d 110, 115-16 (D.P.R. 2003), the court found plaintiffs shooting scene reconstruction expert to be admissible in "testifying as to the evidence gathered at the scene and its congruence with the police version" over the objection that the testimony "consists only of general observations and complaint regarding some discrepancies arising from the physical evidence..." Based upon his qualifications as an experienced crime scene investigator, the court found the methodology neither unreliable nor irrelevant: "Any flaws in" the expert's "otherwise reliable methodology go to the weight and credibility of the evidence and not to its admissibility" because the "adversary process provides mechanisms to address such flaws." Id. at 116.

Mr. Larsen opines that the bullet holes in the garbage bin are "almost identical" to that caused by a 9mm bullet. That is "possible" that the holes could have been caused by a similar, but not identical caliber goes towards the weight of Mr. Larsen's opinion and not its admissibility where Mr. Larsen has reliably excluded non-bullets and dissimilar calibers. Notably, Defendants offer no affirmative evidence that the holes were caused by anything other than a 9mm bullet. Likewise, despite the certitude of Mr. Larsen that the holes were caused by a single bullet, Defendants offer no evidence for their supposition that the garbage bin was somehow shot two times or that a cinder block or some other hard object was present in the garbage bin the night of the incident. This type of fanciful objection to admissibility has led courts to caution that an expert is not required "to categorically exclude each and every possible alternative" but rather need only demonstrate that he has adequately accounted for "obvious alternative explanations in order for his testimony to be reliable." U.S. Information Systems, Inc. v. International Broth. of

Elec. Workers Local Union No. 3, 313 F.Supp.2d 213, 238 (S.D.N.Y. 2004). Accord American Honda Motor Co., Inc. v. Allen, 600 F.3d 813, 817 (7th Cir. 2010)(2000 Advisory Committee's Notes to Rule 702 suggest benchmarks for gauging expert reliability, including "whether the expert has adequately accounted for *obvious* alternative explanations" (emphasis supplied)). Thus, "experts are allowed to posit alternate models to explain their conclusion" where their hypothetical explanation of the possible or probable cause of an event would aid the jury in its deliberation. Walker v. Sao Line R. Co., 208 F.3d 581, 589-90 (7th Cir. 2000). Accord Smith v. Ford Motor Co., 215 F.3d 713, 718-19 (7th Cir. 2000); Darley v. Ford Motor Co., 104 F.Supp.2d 1017, 1022 (N.D.Ind. 2000)(same). Defendants' "two-bullet cinderblock" theory is neither obvious nor supported by record evidence and cannot bar admissibility. Defendants are free to cross-examine Mr. Larsen on their theory.

Davis v. Duran is not to the contrary (Motion 7). There, an expert's experience did not qualify him to testify about "bullet wound trajectories." 277 F.R.D. 362, 372 (N.D.Ill 2011). Davis stressed that the expert's "background is in police practice and procedures, not ballistics" and that the expert provided no proper explanatory reasoning other than he relied "on the totality of his training, education and experience." Id. Here, and unlike the expert in Davis, Mr. Larsen's expertise includes, inter alia, ballistics, and in any event, his opinion is not based on training, education and experience alone, but also upon observations and experimentation. See supra.

Nor does Mr. Larsen's decision not to test for "bullet wipe[4]" make his opinion inadmissible. As Mr. Haag notes, it should be "relatively easy" for an experienced examiner to tell whether a hole was caused by a bullet and that the examiner "may need to carry out some...testing in order to satisfy himself." Haag, Shooting Incident Reconstruction at p. 33. Mr.

[4] Mr. Haag defines "bullet wipe" as gun-shot residue ("GSR") and and/or various metals that a bullet may transfer to the margins of a substance it travels through. Haag, Shooting Incident Reconstruction at pp. 31-32.

Larsen, an experienced examiner, was satisfied with his determination and decided he did not need to test for bullet wipe: the garbage bin has "been sitting there for over two, almost three years, and there's not going to be a wipe or something there. You've got weather patterns hitting the area." Motion, Ex. 2 at p. 292. Mr. Haag agrees: "[t]he evidence surface...is likely to experience some loss or reduction of powder particles and/or GSR deposits through handling ...or exposure to the elements[.]" Haag, supra, at 71-72. Thus, "if the shot was fired from several feet away where only a few powder particles arrived at the evidence surface, the loss of these few particles could result in no evidence being found on the [] submitted object." Id.

Defendants offer no suggestion, much less any evidence, that testing for bullet wipe would counter Mr. Larsen's conclusion. They were free to test the garbage bin for bullet wipe if they so chose. Tellingly however, the City's investigators came to the same conclusion as Mr. Larsen: "[b]ased on the length of time between the incident on 22 August 2008 and the time the garbage can was inventoried on 26 Apr 11, an examination of the City of Chicago garbage can with serial number 152526 was not conducted by the Illinois State Police Forensic Science Center at Chicago. (Att. 72)" Ex. 6 at pp.5-6. Defendants can hardly claim that Mr. Larsen's opinion is unreliable when the City itself declined to ask the Illinois State Police to test the garbage bin for bullet wipe for the same reason Mr. Larsen deemed it unnecessary.

Mr. Larsen's thoroughness stands in stark contrast to Defendants' approach to this critical issue. Asked to "identify all persons who have performed any ballistic or other examination on the Garbage bin," defendants objected on relevancy, burden and overbreadth grounds before stating that they were "unaware of any 'ballistic or other examination' performed" on the garbage can. Ex.7, Interrogatory Answers. It is unthinkable that no such examination would have been performed *if* defendants considered the hole to have resulted from

anything *other* than a bullet. No less illuminating are Defendants' other interrogatory answers:

> 7. With respect each of the holes in the Garbage Bin, do you believe either of them to have been caused by a bullet? If not, identify what you believe to have been the cause of each hole. In either case, state the bases for your conclusions.
>
> Answer: Defendant City objects to this interrogatory as vague as to "each of the holes," as irrelevant to any issue in this lawsuit, not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it seeks information beyond the City's knowledge. Defendant City further objects as it is not qualified to offer expert opinions as to causation of any alleged "holes" in garbage bin R060152526
>
> 8. Has any agent or employee of the City opined that either of the holes in the Garbage Bin was caused by a bullet? If so, provide the identity and contact information for such person(s).
>
> Answer: Defendant City objects to this interrogatory as vague as to "either of the holes," as irrelevant to any issue in this lawsuit, not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it seeks information beyond the City's knowledge. Subject to and without waiving said objections, Defendant City answers that it is not aware of any opinions rendered by any of its agents or employees related to City or Police business, memorialized in a report or document.

See Ex. 7. Put another way, the City's vast array of law enforcement personnel are "not qualified" to identify a bullet hole. With all the shootings in this town, they must be seeing bullet holes in their sleep. Alternatively, the City is capable of making such a determination, but curiously chose not to "memorialize" it. Given these antics, it is ironic to call Mr. Larsen's bullet hole analysis "unreliable."[5]

### B. The Bullet Holes in the Garbage Bin Were by Rubald

Next, Defendants challenge Mr. Larsen's opinion that the bullet holes in the garbage bin

[5] Mr. Larsen's unrebutted opinion that the bullet holes through the bin were made by a single bullet (i.e. entry and exit) also refutes Defendants' attack on his trajectory analysis of those holes based upon their speculation that the holes were caused by two different bullets. Motion at p. 8. As we have said, no evidence support the occurrence of *two* additional, unaccounted for shots, neither of which having the power to exit plastic. See supra at pp. 3-4.

were made by Rubald the night of the incident while pursuing Mr. Winford. Motion at 3-6, 8-10. After having established that the bullet holes in the garbage bin were made using a single approximately 9mm bullet, Mr. Larsen determined the trajectory of the bullet's path to be approximately 33 degrees on the horizontal travelling northwest, and approximately 10 degrees downward. Motion, Ex. 2 at 11. Extending a trajectory rod out from the garbage bin as it was positioned the night on the incident, Mr. Larsen found that the bullet's path was consistent with having been fired from a weapon positioned approximately 40 to 44 inches off the ground and approximately ten feet to the southeast of the bin, which coincided with the height of a weapon pointed out the front passenger window of a vehicle with the same dimensions of the vehicle Rubald was riding in the night of the incident - approximately 40 to 44 inches. Id. at 11-12.

Mr. Larsen also investigated other obvious possibilities. Looking for evidence that would confirm Rubald's account of his errant bullet, Mr. Larsen swept the ground between the garage wall behind the gate and the fence line with a metal detector with no result. Motion, Ex. 4 at p. 28. He also searched the area surrounding the fence line for the second missing cartridge from Rubald's weapon, again with no result. Id. at pp. 29-30. Lastly, because of the height and location of the garage wall behind the gate, Mr. Larsen expected to find some evidence of Rubald's errant shot in the wall. Id. at 239-240. As Mr. Haag recognizes, in bullet ricochet situations, the presence of a suspected bullet-mark can be detected through copper and/or lead testing carried out by the transfer method Haag, Shooting Incident Reconstruction at p. 123. Accordingly, after examining the wall for marks that looked like they could have been caused by a ricocheting bullet, Mr. Larsen tested two suspects using a lead and copper testing kit with negative results. Motion, Ex. 4 at p. 29. In sum, Mr. Larsen was not able to find any physical evidence consistent with Rubald's account of his other shot despite his comprehensive efforts.

Next, Mr. Larsen investigated the possibility that the bullet holes in the garbage bin were caused on some other date. Examining and enlarging the scene photographs taken by the Chicago Police Department the night of the incident, Mr. Larsen discovered "a lightened mark" on the garbage bin "in exactly the same place where the bullet hole entry is found on the actual garbage can." Motion, Ex. 6; see Ex. 8[6]. Thus, he was able to exclude the possibility that garbage bin was shot after the incident. Id. He then sought any evidence that the bin might have been shot before the incident. We thus obtained records of all police service calls made in the area of the alley, which revealed 46 incidents of "shots fired." Motion, Ex. 6 at p. 1 and Ex. 1. Visiting each address, Mr. Larsen determined that only one "offered a path in which any 'shot fired' could have traveled in order to cause" the bullet holes in the garbage bin. Motion, Ex. 6. at 2; Motion Ex. 4 at 36-41. But that report occurred two months *after* the incident and could be excluded. Id. Armed with information about other shootings in the area, Mr. Larsen could exclude the possibility that any of them caused the bullet holes in the garbage bin. Id.

Defendants nonetheless brand Mr. Larsen's garbage bin findings "wild speculation," because he cannot scientifically and categorically exclude the *possibility* that the bullet holes were caused at some other time. Motion at pp. 3-6. But Mr. Larsen was not required "to categorically exclude each and every possible alternative" for his opinion to be admissible where he has adequately accounted for "obvious alternative explanations." U.S. Information Systems, Inc., 313 F.Supp.2d at 238. And it bears repeating that he may offer his hypothetical explanation of the possible or probable cause of an event, anchored in the physical evidence, as he has done. Walker, 208 F.3d at 589-90.

Mr. Larsen did infinitely more than Defendants, who did nothing. They never checked

[6] Ex. 8 contains a magnification of FCRL 000347, a photograph of the garbage bins taken by the CPD the night of the incident and a photograph of the bullet hole entry taken by Mr. Larsen during the course of his investigation.

the "shots fired" sites, preferring instead to ridicule Mr. Larsen's thoroughness for having done so. Instead, they wager their all on the pure conjecture that some *unreported* shooting may have accounted for the bin's bullet holes. Motion at p. 6. Absent is any evidentiary basis for this hypothesis. As Mr. Larsen's report shows, there were 45 "shots fired" incidents in the area between 2006 and 2011. Only *one* fit the bill - the shooting here. Thus, Defendants urge exclusion of Mr. Larsen's evidence because of the unsupported possibility of unreported shootings that carried only a 1 in 45 chance of even occurring at roughly the same location. If that is the test of reliability, no expert can ever testify.

But even that percentage is overstated. Unlike a level path, the *downward* path of the bullet through the bin limits the source of the shot to an exceedingly circumscribed area of the alley preceding the bin. Indeed, within a very short distance away from the bin, the shooting position becomes too high to have occurred from someone sitting in a car, or even standing. Left then is an exceedingly confined shooting range through which Rubald concededly passed. The pure surmise that another shooting *might* also have occurred in that tiny range cannot be the basis to exclude Mr. Larsen.

The real argument here is not about Mr. Larsen's qualifications to identify a bullet hole or take related measurements. It is rather a challenge to the relevancy of that evidence, namely, that it might be irrelevant because the shot might have been from another occurrence. The odds above, however, clearly make it more likely than not that the shot was from *this* occurrence, and if so, it could not be more relevant. Rule 401 strongly favors admission where relevancy is at issue. See United States v. Boros, 668 F.3d 901, 903 (7th Cir. 2012)("Although the testimony had only minimal relevance, the threshold for relevance under Rule 401 is quite low.")

Relevant evidence does not become irrelevant by the alternative, speculative possibility

of a fantastic chain of coincidences - i.e. another shooting, that went unreported, with the same or similar caliber bullet, at precisely this location. Layered atop those coincidences would be the fact that if another bullet, rather than Rubald's, caused the holes in the bin, Rubald's other bullet will be totally unaccounted for, including the further curiosity that while he claimed to have taken both shots from the same place, only *one* shell casing was found there. Motion, Ex. 2 at 6; Motion, Ex. 4 at 29-30; See Roundtable Report, FCRL 000107. Cf. Tellabs Operations v. Fujitsu, 882 F.Supp.2d 1053, 1068 (N.D.Ill. 2012)("claims of a series of improbable events can carry a party only so far"); In re Elm St. in City of New York, 246 N.Y. 72, 78 (1927) (Cardozo, J.)("If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous.")

Accordingly, Mr. Larsen's bullet/bin evidence is relevant. It will be for the jury to determine whether Rubald's or some other hypothetical bullet pierced the garbage bin, just as juries regularly choose among constructions of the evidence. See United States v. Stevens, 453 F.3d 963, 966 (7th Cir. 2006). To be sure, bullet hole evidence is regularly admitted without "categorical" certainty about its source. See Moore v. Quarterman, 534 F.3d 454, 461 (5th Cir. 2008)(bullet holes in building); United States. v. Tisdale, 248 F.3d 964, 967 (10th Cir. 2001) (probable cause supported by bullet holes in exterior of house); Pettus v. City of New York, 2011 WL4458901 *5 (E.D.N.Y. 2011)(bullet holes in door supported probable cause, even though no evidence as to when they got there); Caballero v. Hartley, 2009 WL 2341744 *12 (C.D.Cal. 2009)(denying habeas relief where trial evidence included hole in plaster that "was consistent with one that could be made by a bullet"); Games v. Lamarque, 2006 WL 2788266 *13 (E.D.Cal. 2006)("the primary evidence of intent to kill consisted of the circumstances surrounding the shooting itself, and the physical evidence relating to location of bullet holes,

along the path of Burks's retreat."); Ho v. State, 171 S.W.3d 295, 301 (Tex.App. 2005) ("evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence....We find that the existence of a bullet hole in Le's car has a tendency to make the fact that Le's car was involved in the freeway shooting more probable and is thus relevant under Rule 401").

Indeed, the only thing that should be barred on relevancy or speculative grounds here is any argument that some *other* unidentified shooting accounted for the bullet holes in the garbage bin. See People v. Lewis, 2010 WL 4628699 ** 2-3 (Mich.App. 2010)(excluding speculative evidence that bullet holes had come from some prior incident in a high crime area - i.e. "that the existing bullet holes were a result of such a hypothetical shooting"). Even if it is not, such speculation affords no basis to bar Mr. Larsen's evidence. Kansas v. Colorado, supra, 533 U.S. 1, 18-19 (2001)(rejecting speculative attack on expert's evidence).

Also speculative is the argument that Mr. Larsen might have mistaken for a bullet hole in a crime scene photograph what may actually have been a "shadow[]" "defect[]" or "discoloration". Motion at p. 4. No evidence supports this thesis, which relies on yet another coincidence--that this supposed "shadow" occurred in the exact location where a bullet hole later appeared. And that speculation pales in comparison to the inane conjecture that the photographed bin and the one in which bullet holes were found are *different bins*, despite their identical serial number (R060 152526). Had two bins been assigned this number, the City would have evidence of it, just as it would have noted it in response to our interrogatories calling for all known locations of the garbage bin assigned serial number R060 152526. See infra at 33.

Sillier yet is the speculation that the garbage bin could have been moved to, and shot in,

another location. Motion at 6. No evidence supports this additional coincidence - i.e. that the garbage bin was present in the alley both on the night of the incident and again when Mr. Larsen visited the scene, but not in between. This too is refuted by Defendants' Answer to Plaintiffs' Second Set of interrogatories, where Defendants admit that the garbage bin with serial number R060 152526 "has been assigned to 651 E. 89th St., Chicago, Illinois since May 2, 2006," without a peep about some other location. Ex. 7 at p. 1. Perhaps Defendants will argue at trial that Mr. Winford was carrying the bin over the gate with him when he wheeled back to fire.

Defendants' argument that the "shots fired" addresses might not correspond to the location from which the shots were fired points to no evidence. Motion at p. 6. And their argument that the shots fired list is temporally irrelevant to this case, id., ignores its temporal overlap with the date of the shooting. The temporal ambits of the list are largely attributable to Defendants.[7] Equally meaningless is the quibble that Mr. Larsen was unconcerned that the shots fired list did not specify whether the shots were inside or outside a given location, as though he could do anything about that gap if he was. Important for him was that no part of the listed locations were in the line of fire of the bin. Motion, Ex. 6 at 2; Motion Ex. 4 at 36-41.

Repeating the criticism that Mr. Larsen did not test the bin for "bullet wipe" does not validate it. Motion at 5. As we have said, too much time had elapsed for this test to be productive, a point supported by Defendants' treatise as well as I.P.R.A.'s declination to do this test for the same reason. And that test would not have shown the timing of the shot in any event.

Also specious is the contention that Mr. Larsen's positioning of the simulated vehicle in the alley for his garbage bin shooting analysis has no basis in the record. Motion at p. 9. It is undisputed, however, that the Officers pursued Mr. Winford down the alley and that while doing

[7] See Ex. 7 at pp. 2-3 where Defendants were asked to identify any known or reported shooting within 100 yards of the garbage bin. Defendants responded with a list of service calls to the vicinity from May 2, 2006 through April 9,

so, Mr. Winford was "always a little bit ahead of [them]," "five feet or so." Ex. 3 at pp. 44-49; Motion at p. 9. Based upon the scene photographs taken the night of the incident (see Motion, Ex. 2 at p. 6), the easternmost two garbage bins were not positioned against the chain link fence like the western two bins, but were instead "right up to the north edge of the concrete surface of the alley pavement." Motion, Ex. 2 at p. 9. Thus, these two eastern bins would have prevented the officers from driving on the northern side of the somewhat narrow alley, lest their rearview impact the bins. And utility pole on the northern side of the alley prevented the Officers from driving on that side. See Motion, Ex. 2 at p. 4, Diagram 1. Thus, it was logical to place the Officers' simulated vehicle "more to the south side of the alley roadbed" than the north side. Id. at p. 9; see Motion, Ex. 2 at p. 11, Photo Plate 12. Of course, Defendants do not argue, much less adduce evidentiary support for the notion that moving the vehicle to the north or south by some unspecified footage would impact Mr. Larsen's opinion.

Defendants also incorrectly claim that Mr. Larsen has no basis for concluding that the bullet that hit the garbage bin was consistent with having been fired by Rubald sitting in the passenger seat of his vehicle. Motion at pp. 9-10. Using the same model vehicle as the officers' (Motion, Ex. 2 at p. 8), Mr. Larsen found that the trajectory rod extended outward from the bullet holes in the garbage bin intersected with the height of the vehicle's front passenger window - approximately 40 to 44 inches off the ground (Motion, Ex. 2 at p. 11) - when the vehicle was approximately 10 feet to the southeast of the bin. Motion, Ex. 2 at p. 12. As he put it:

> "[t]he bullet hole [in the garbage bin] was no more than 34 inches off the ground, and its angle was at 10 degrees on the vertical. So if you're looking at the car window and you're taking the shooter's arm, this is parallel to the ground, when you take that and you run that angle and descend it down 10 degrees, it matches someone very closely sitting inside a platform such as a car. And that alley is only so wide and that car is only so

---

2011 from which Plaintiff distilled the shots fired list. Id; Motion, Ex. 6 at p. 1 and Ex. 1.

> wide, so when you run it back 34 degrees, it puts somebody in the car...and they're shooting it out that window, and it's at approximately a 33-degree angle plus or minus 7."

Motion, Ex. 4 at p. 290. Thus, it cannot be said that Mr. Larsen provided no information as to his methodology or reasoning and that he relied solely upon his experience.

The argument that Mr. Larsen has no basis for concluding that Rubald's first shot was taken at Mr. Winford's *back* as he fled down the alley ignores the evidence. Motion at p. 8. Defendants do not dispute that Mr. Winford was fleeing down the alley. People don't flee running backwards, and Defendants never said Mr. Winford was. If, as the garbage bin evidence suggests, Rubald shot at Mr. Winford much earlier than the officers said - i.e. while he was fleeing - they necessarily shot at his back. Nor does "geometry indicate[] that, after exiting the garbage bin, the bullet would have struck the east wall of the garage behind the bins." Motion at p. 9. A bullet exiting the garbage bin at approximately a 34 inch height and travelling at a 10 degree downward angle would have struck the ground either before or after the fence behind the garbage bin. See Motion, Ex. 2, p. 12 at Diagram 4. The garage wall is too far to the west of the garbage bin to have been impacted.

In sum, Mr. Larsen is highly qualified to opine that the bullet holes in the garbage bin were made by Rubald as he pursued Mr. Winford, and that opinion is firmly supported by the actual evidence in this case. Defendants' attack on Mr. Larsen's methodology consists of nothing more than speculation concerning what alternative, *non-existent* evidence might show. That is not a basis to disqualify Mr. Larsen. Kansas, supra, 533 U.S. at 18-19; TAMKO Bldg. Products, Inc. v. Factual Mut. Ins. Co., 890 F.Supp.2d 1129, 1144 (E.D.Mo. 2012)("the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the

opinion in cross- examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.")

### III. The "Execution" of Martinez Winford Revealed by Mr. Larsen's Analysis

Mr. Larsen's analysis of the trajectory of the bullet through Mr. Winford demonstrates that he could not have turned back toward the officers to shoot at them as they said, leaving aside the folly of the overall story. No less impeaching is the garbage bin evidence, which reveals Rubald's attempt to gun Mr. Winford down on the street, as opposed to while he was perched atop a gate like pelican. If Defendants' claim to have shot in self-defense is a lie, the opposite is true - Mr. Winford was executed. While Mr. Larsen will testify about the evidence that supports that conclusion, he will not voice that ultimate conclusion unless asked by Defendants, just as he will not state that defendants are "lying," although acceptance of his analysis will make that conclusion ineluctable. Thus, the concerns raised at page 10 of the Motion are unwarranted.

### Conclusion

The Motion should be denied.

Respectfully submitted,

/s Andrew Staes
Andrew Staes
Michael Cohen

Staes & Scallan, P.C.
111 W. Washington St.
Suite 1631
Chicago, IL 60602
(312) 201-8969

CERTIFICATE OF SERVICE

I, Andrew Staes, hereby certify that I have caused Plaintiff's Response To Defendants' Renewed Motion To Bar Testimony Of John Larsen to be served upon:

Liza Marie Franklin
City Of Chicago, Department Of Law
30 N. LaSalle Street
Room #1400
Chicago, Illinois 60602
*via ECF filing notification and U.S. Mail on July 1, 2013.*

Lindsay Erin Wilson Gowin
City Of Chicago, Department Of Law
Federal Civil Rights Division
30 N. LaSalle Street
Chicago, Illinois 60602
*via ECF filing notification and U.S. Mail on July 1, 2013.*

/s/ Andrew Staes
ANDREW STAES